[Crim. No. 3801. In Bank.—December 31, 1934.]

THE PEOPLE, Respondent, v. ROBERT E. DORLAND, Appellant.

Edgar A. Luce and Fred Kunzel for Appellant.

U. S. Webb, Attorney-General, Thomas Whelan, District Attorney, and John T. Holt, Deputy District Attorney, for Respondent.

SEAWELL, J.—This appeal, being within the original appellate jurisdiction of the District Court of Appeal, was heard and determined in the District Court of Appeal, Fourth District, Presiding Justice Barnard writing the opinion of that court.

On petition for hearing, an order of transfer was made to this court. In granting the petition for hearing, we were influenced largely by the unusual nature of the offense itself, the character of the parties involved, and the manner in which the offense was perpetrated. An important question of law also appeared to be involved as to whether preju-

dicial error was committed by the district attorney in asking the wife of appellant, on cross-examination, if upon her visit with her brother on the day following appellant's arrest to the home of the parents of the boy against whom the act of delinquency is alleged to have been committed, she did not request the father of said boy to drop the charges and give assurances, if he consented to do so, that the family of appellant would care for the appellant by placing him in a sanatorium or an asylum. It was made to appear that she had talked the matter over with the appellant's family. The inference to be drawn, being the subject-matter of the foregoing question, was that the family had agreed upon such a plan.

We have given full consideration to this assignment of error, as well as to the other assignments urged by appellant, and we have been compelled to conclude that the wife of appellant, having been called as a witness on behalf of her husband, her activity in attempting to weaken or break down the prosecution by persuading or inducing those most directly affected by the wrong committed to relax their efforts or use their influence to have the case dismissed, placed her on the same level with all other witnesses in the case, and that her interest was to be considered by the jury in the same manner as would the interest of any other witness in the case. Of course, whether the acts of a wife, under the circumstances of the case, were committed with a view of wilfully attempting to obstruct justice or whether the result sought to be accomplished was committed in good faith and with the conviction that the charges were false, would be an element that should enter into the determination as to what credit the testimony of the witness should be given. The *bona fides* would be a question for the jury. Three or four persons testified to the proposition made by the Dorlands to the effect that the appellant would be taken care of in a public or private institution, if the case should be dropped, while the appellant's wife and brother deny that any such proposition was made.

The opinion of the District Court of Appeal fully meets the objection made to the admissibility of said testimony. The trial court took extraordinary pains to, and did repeatedly, admonish the jury, both by oral and written charges, that said testimony was limited exclusively to the activity

or interest as shown by said persons in attempting to induce the father of the boy to abandon prosecution of said case.

This action has received meticulous consideration by the trial court, by the District Court of Appeal, and by ourselves. We have read the entire record, consisting of five hundred pages of testimony taken both at the trial and upon the application of appellant to be released on probation. The trial court was exceptionally indulgent and considerate of every legal right to which the appellant was entitled. It was the opinion of these two courts, after a trial and examination of a record which presents a most unusual course of human conduct, that the jury's verdict could not be disturbed. This court, having considered every question which no doubt disturbed the judicial poise of said two courts, finds itself in a like frame of mind.

The fourteen year old boy, victim of the alleged immoral acts, was assailed by the defense from every conceivable angle. He was examined and catechized by psychiatrists, physicians and lawyers. His former teachers, officers of the school board, and persons who had known him from early childhood were called as witnesses as to his mental and moral qualities. He stood the test to the satisfaction of the jury and we may add that the evidence tending to show a normal, moral American boy outweighed any suggestions made to the contrary. It is true that some of the acts which he testified to as having been committed by the appellant almost challenge human credibility, but this may be said generally of most all persons who commit unnatural sexual acts. There is no rule of logic by which these acts may be tested. There are but few serious contradictions in the boy's testimony.

The appellant's attempt to account for his presence in the neighborhood and his reason for courting the company of a fourteen year old boy are not impressive. He hailed the boy, he claims, to gain information about persons in a locality in which he was a stranger and about which matter the boy would probably have no knowledge. He at first stated that he was attempting to locate homestead No. 25, the location of which he afterward admitted he knew was not situate in the neighborhood in which he was making inquiry. He was on the highway at the time he hailed the boy, within sight of and but some 300 feet from an oil and

gas station, where he could have made inquiry of three or four men, who would have been more likely to have given him the desired information concerning land ownership than would the boy. During all of his stay of approximately one hour and a half in the locality in question, he made no inquiry of a single other person for the information which he says he was in search of, and he was in the boy's sole company during all of said time. This, too, in view of the fact that he testified that, after the boy had been in his company but a short while, the boy made reference to lustful subjects and he, a man of thirty-five years, did not reprove the boy, but remained in his company. The appellant utterly failed to give any satisfactory reason why he sought the boy's company or why he was in the particular locality, with no apparent objective, at about the time school was dismissed.

When brought into the presence of the boy and the officer, he listened to the boy relate a direct accusatory account of appellant's mistreatment of him and, when the boy concluded, he was asked by the officer if he wished to interrogate the boy as to his accusatory charges. He declined to admit or refute the charge. His only anxiety was as to the boy's ability to identify the gun.

There are other facts tending to corroborate the testimony of the boy. Of course, corroboration is not essential to an affirmance of the judgment. Every presumption must be indulged in favor of the judgment after conviction. This is the rule in criminal appeals. The jury accepted the testimony of the prosecution's witnesses as against the accused and his witnesses, and there is no legal reason why this court should disturb its findings.

The case is very fully and fairly reviewed by the District Court of Appeal. Every material objection raised against the judgment has been fully and ably considered. Without further duplication of the facts or discussions of the law, we herewith adopt said opinion as our opinion in words and figures as follows:

"The defendant was charged with an assault with a deadly weapon upon the person of Elmer Perigo and, in a second count, with a violation of the Juvenile Court Law alleged to have been committed by doing certain acts with the said Elmer Perigo, a boy of the age of 14 years, and

causing him to do certain acts which would cause and manifestly tend to cause him to become a delinquent person. He was found guilty by a jury on both counts and was sentenced to serve a year in the county jail on each count, the sentences to run concurrently. This appeal is from the judgment and from an order denying a motion for a new trial.

"The appellant, who was about 35 years old, lived on a homestead which he was improving near Temecula, in Riverside county. His wife taught music in San Diego and in Pasadena and usually spent about two days of each week at the homestead. On Tuesday, October 31, 1933, the appellant drove to Temecula for some supplies, returning about noon. His wife missed certain things which she had ordered and searched the car for them without success. At his wife's request the appellant started to Temecula about 2:30 p. m. to secure the missing supplies. As additional reasons for the trip the appellant testified that he desired to take a ride, since his wife was gone with the car during most of the week, that he wanted to look for a homestead for a man named Newman, who was employed by him, and for which they had both made a search a week before, and that he desired to locate a road which ran into Temecula canyon.

"The testimony of the appellant and of the prosecuting witness is in agreement as to the following: Shortly after 3:30 on that afternoon, while he was driving south along a paved road that runs between Temecula and Fallbrook, the appellant came upon the boy, Elmer Perigo, who was on his way home from school. The boy got into appellant's automobile and they proceeded south toward Fallbrook. Somewhere from 400 to 700 feet south of the point where the boy entered the car a dirt road leads off to the left and up over a hill, there being an oil station at the point where this road leaves the paved highway. The boy lived over the hill on this road and about a mile and a half from the oil station. The appellant turned to the left on this dirt road and, in so doing, passed within a few feet of the oil station. When he had proceeded about 400 feet along this dirt road leading uphill to the boy's home, the appellant turned to the right and went down an old stage road which had long been overgrown but which had recently been cleared off by the 'C C boys'. The appellant had gone

down this old stage road with Newman about a week before when they had searched, without success, for a homestead. On the occasion here in question the appellant drove down this road a distance of about three miles, turned around and came back to the beginning of this road and then turned to the right toward the boy's home. This road was narrow and upgrade and the boy got out of the car at a point which he told the appellant was about a half mile from his own home. The appellant turned around by entering a driveway which led to a house and then backing into the road. He then proceeded back to the paved highway and went on toward Fallbrook.

"The boy testified that he looked at the license number as the car turned around, that he wrote the number on the ground two or three times so that he would not forget it, and that he then put the number down on a piece of pasteboard which he found by the roadside. Although his father scolded him when he returned home for being in the car the boy told his father nothing at that time of what had occurred and did not tell anyone until the next Friday. The next Friday afternoon he reported the incident to a traffic officer, without giving any details, and that night he told the full story to his brother and to his father, and later to deputies from the sheriff's office. His story as related on these occasions was essentially the same as that related on the witness stand. He gave the officers the number of the appellant's automobile, described the appellant and how he was dressed, and described the gun which he said had been used. He first described this gun as having a white barrel and a black handle and then as one that was nickel-plated with a black handle. A revolver answering this general description was later found in the appellant's house on the homestead. The appellant was arrested on the night of November 10, and later that night was confronted with the boy, whose story was repeated to him.

"While the appellant admits giving the boy a ride on this occasion and agrees with the boy's statement as to where they went and where the boy got out of the car, their testimony is directly conflicting as to what occurred at the time the boy got into the car and what occurred on the old stage road at the point where the appellant turned around. The boy testified that shortly after 3:30 o'clock on this

afternoon he walked from the schoolhouse to the paved highway with another boy named Robert Boren; that as they arrived at the highway Boren started north and he started south; that almost immediately after he left Boren the appellant came along in his car and stopped; that the appellant asked him if he knew where a man named Alexander lived; that he walked over to the side of the car and replied that he did not know anyone around there by that name; that the appellant immediately stuck a gun in his face and told him to get in the car or he would shoot him; that he had the gun in his right hand but did not reach outside of the car, although he held it above the door; that he did not see a gun when the appellant first spoke to him and that he must have had it lying on the seat; that when he got into the car he saw the gun in the appellant's left hip pocket; that as the appellant turned to the left around the oil station and onto the dirt road, he saw the man who ran the oil station, whom he knew well, and perhaps another man or two; that he did not see his father there; that as they proceeded down the old stage road they passed a boy whom he knew and also saw a man whom he knew working near a house; that he was frightened and afraid that the appellant would shoot him, but that he did not cry out or ask for help from any of the people he saw; and that as they proceeded down the old stage road the appellant made some immoral statements which need not be here repeated. With reference to the place on this road where the appellant turned around, the boy testified that the appellant stopped for what he thought was about twenty minutes. It would serve no useful purpose to recite the boy's story of what there occurred. It is sufficient here to say that the acts thus charged to the appellant, if committed by him, were entirely sufficient to justify his conviction upon the second count of the information. In this connection the boy testified that the appellant threatened to shoot him if he did not do as he was told, that he then saw the gun in the appellant's left hip pocket, and that at all times he was afraid the appellant would shoot him if he did not do as he demanded.

"The appellant testified that the boy made some remarks of an immoral nature to him as they were going down the old stage road, denied that he had made any to the boy,

denied all of the boy's statements as to what occurred at the point where they turned around, and testified that he turned his car around without stopping and proceeded back and to the point where the boy got out of the car. He denied the boy's statements about the use of a gun at the time the boy got into the car and testified that he did not have a gun with him on this occasion and that he had never carried one with him.

"There was evidence that the boy's father was at the oil station when the appellant's car went by, that he recognized his son, although the boy did not see him, that he asked the station operator who it was the boy was with, that the station operator replied that he did not know, that he then asked two school children who came along, that they replied that it might have been the scout master, and that he gave the matter no further thought. There was also evidence that the boy attended a party at the schoolhouse that night, but told no one there about these occurrences. The boy's father testified that during that night the boy talked in his sleep, that when he went into the room the boy was saying 'Oh don't kill me, don't kill me,' that when he came in the boy roused and said he was all right, and that such a thing had never occurred before. The appellant sees in this only evidence that the boy had eaten too much at the party.

"The main contention here made is that the evidence is legally insufficient to support the verdict, in that the boy's statements are so inconsistent and his evidence so inherently improbable as to be unworthy of any belief. While it is conceded that the testimony of the prosecuting witness, if believed, is sufficient to support the verdict, it is contended that the same is without corroboration and is in itself so improbable as to furnish no support therefor. While it has been held that a verdict may be set aside where the entire evidence is so improbable and incredible as to amount to no evidence at all, the rule is that such improbability must amount to incredibility and must very clearly appear in order to justify a reversal. (*People* v. *Weaver*, 123 Cal. App. 347 [11 Pac. (2d) 69]; *People* v. *Niino*, 183 Cal. 126 [190 Pac. 626]; *People* v. *Willard*, 150 Cal. 543 [89 Pac. 124]; *People* v. *Fleming*, 166 Cal. 357

[136 Pac. 291, Ann. Cas. 1915B, 881] ; 8 Cal. Jur. 590, and cases there cited.)

"It is argued that it is improbable and unbelievable that an educated man of good family with previous good reputation, and who is happily married, would do the acts attributed to him by the boy; that such a man would use a gun in daylight in such proximity to an oil station where there were other people at the time; that such a man would, after doing such acts, drive toward the boy's home instead of fleeing at once; that a boy would, under such circumstances, refuse to do the first thing requested of him and then accede to the second command; and that a boy of that age, after such an experience, would not immediately report the matter to his parents. It is further urged that the boy's story was definitely proved false by the fact that he testified that he did not see a scar on the appellant's body when a photograph, which was introduced in evidence, shows a scar on the appellant's groin. Not only was this last matter one for the jury, but the photograph rather clearly indicates that this scar would probably not be seen under the circumstances narrated by the boy. While it is always hard to believe that a man of previous good standing will commit such an act, experience demonstrates that this, in itself, cannot be taken as conclusive. It is entirely possible and not improbable that such a person might consider that he was taking less chance of being reported by taking his victim to the vicinity of his home than by leaving him several miles away. There are many reasons which might impel a boy, under such circumstances, to be slow in reporting such a matter to his elders, and the records of such cases show that this frequently happens. The most improbable part of the boy's story is that portion relating to the use of a gun at the time he entered the appellant's automobile and in the fact that he did not appeal for help as they passed the oil station and as they passed near to other people. While this portion of the story contains an element of improbability it is not impossible that some such thing could occur. Under the circumstances as related by the boy the gun could not have been seen by anyone else. A boy of fourteen might not realize how easy it would be to get help at the oil station and he might be too frightened to think and act quickly. There is one piece of evidence,

which need not here be mentioned, which indicates that the boy was badly frightened while down on the old stage road. His talk in his sleep that night, though not conclusive, may well have been the result of a severe fright. The boy described the gun he said was used and one of that description was found in the appellant's home. While it may be true, as argued, that many people have guns of this general description, the fact is not without its significance and the appellant, after his arrest, expressed particular interest in whether the boy could identify the gun. The boy's story as told to the officers, as told in the presence of the appellant after his arrest, and as told on the witness stand, was clear cut and, in the main, unshaken by a most thorough and grueling cross-examination at the hands of exceedingly able counsel. It is true that the boy testified at the trial that as he passed the oil station in the appellant's car he saw the station operator and another man in an automobile, that he first reported the occurrence to a traffic officer and that, in telling of what occurred on the stage road, he told of the appellant using the contents of a cold cream jar, while at the preliminary hearing he had referred to this as a cold cream bottle, had said that he first told his brother and had testified that he saw no one at the oil station except a boy. These were the only inconsistencies which were developed in the boy's direct testimony, filling fifteen pages of the transcript, and in a cross-examination covering eighty-six pages thereof. Variances in statements as given at different times may indicate honest intentions on the part of the witness rather than the contrary, and the inconsistencies here pointed out were matters to be weighed by the jury and are far from sufficient to enable a reviewing court to upset the findings of a jury.

"Not only was the boy's story unshaken in its essentials, but it finds support and some corroboration in other portions of the evidence. Before the defendant was located the boy described him to the officer, described the clothes he wore, described the gun and gave the number of his automobile. While no good reason appears for the boy making up such a story about a man whom he had never seen before, and who had merely given him a ride, it is argued that the boy had heard other stories of this nature, that his father undoubtedly severely reprimanded him for riding with

a stranger, and that the boy undoubtedly exercised his imagination for the purpose of justifying such an action. Had he desired to thus justify himself it would seem likely that he would have told the story at the time and not after the incident was presumably forgotten, and it is to be noted that he took down the number of the appellant's car immediately after he alighted therefrom, a matter which is most unusual and in no way explained on the theory that the appellant had merely given him a ride. We think some corroboration of the boy's story is also to be found in the inconsistent and improbable story told by the appellant and in his conduct when confronted by the boy.

"A deputy sheriff testified that when he questioned the appellant about the boy's charges the appellant first stated that the boy hailed him and later that he stopped the boy and asked him where a certain person lived. Whether the boy hailed him first or whether he first stopped the boy, he insists that the boy asked him for a ride. He was heading south on the paved highway leading to Fallbrook and the boy would have no reason to believe that he was intending to leave that highway. It was only a few hundred feet to the oil station where a dirt road led off to the left and uphill to the boy's home. It seems unreasonable that the boy would expect him to take that narrow uphill road or that he would ask for a ride for those few hundred feet to the oil station. The appellant testified that he had intended going toward Fallbrook as he was looking for a road that led off to Temecula canyon and that when the boy asked him for a ride he told him he could not take him far and that the boy said he would get out when they came to his road. If the boy could have guessed that the appellant would leave the highway and then leave the dirt road within four hundred feet from the oil station, it seems unreasonable that he should have asked for a ride for this short distance, that when they arrived at that point and the appellant turned onto the stage road the boy would say nothing about leaving the road to his home, and that the appellant would not discover that this had occurred until he was on his way back and had again arrived at that point. Although the appellant says he had warned the boy he could take him only a short distance he left the highway almost immediately, left the other road almost immediately thereafter and

proceeded along an old little-used road without asking the boy whether or not he wished to continue in that direction. Why he left the highway and why he later left the other dirt road and took the old stage road is not satisfactorily explained anywhere in the evidence. The only explanation given seems so improbable as to add considerable support to the boy's story. He said that he was looking for a homestead for his employee Newman, for which they had looked the preceding week. Not only had he testified that his main purpose. was looking for a road to Temecula canyon and that he intended going on toward Fallbrook in looking for this road, but he admits that he had driven down this old stage road with Newman the week before, at which time they were unable to find any homestead. There is evidence that that very morning he had seen maps and other information which disclosed that the homestead in which Newman was interested was not in that direction. He further testified that when he went down that road on this occasion he did not stop anywhere or make any inquiry as to any homestead. It is not a little strange that the appellant should stop this boy and inquire about certain parties who were supposed to know about this homestead and then, without making any inquiries elsewhere in the neighborhood, should proceed at once to this road which he had already learned did not lead to the desired homestead, and which he also knew was not the road to Temecula canyon of which he was in search when be met the boy. Under the circumstances, his explanation of why he took the boy on this side trip on this lonely road, over which he had gone the week before, is most unsatisfactory. It also seems strange that after telling the boy he could not take him far, he would not only take him farther from home, but upon returning to the point of digression would again go out of his way to take the boy nearly, but not quite, to his home. He explains his leaving the boy at this point by saying that the road was getting narrow and he desired to turn by going into a private driveway and backing into the road. No reason appears why he could not have made a turn in a similar way at the boy's home or why any possible desire to aid the boy in escaping punishment for tardiness could not have been better accomplished by taking him the rest of the way. There is also evidence that the boy did not get home until one and one-

half hours after the appellant picked him up on the highway and that the boy's father had walked more than one and one-half miles during less than the time in which the appellant says he drove seven miles without stopping. While the latter is possible, it may be added to the other improbabilities appearing in the story as told by the appellant.

"It further appears that while the appellant denied the boy's charges when first informed of them by the officers and again after a conference at which the boy was present, he had nothing to say when confronted by the boy and the boy's story in the presence of the officers and the boy's father. One of the officers testified that immediately following this incident he took the boy and the appellant into a separate room and there suggested that the appellant question the boy about his story, and that the only question then asked by the appellant was as to whether the boy could identify the gun. With reference to this occurrence, the appellant testified as follows: 'After that, Mr. Macomber took me into the sheriff's room with the boy alone, and at that time there was just the three of us in the room, Mr. Macomber, the boy and myself, and he asked me to question the boy, and I said, "Well, how do you mean?" "Well," he said, "Go ahead and ask him questions." And I said, "Well, I couldn't do that, it was not my place." He said "All right, I give you permission to ask the boy questions." And I hesitated, and felt that it wasn't my place to question the boy. It wouldn't do any good anyhow obviously, although I did ask him one question, I forget what it was, whether he was a city boy or not, but then I felt it wasn't my place to ask the boy any further and I told him I wouldn't question him any further. We then went out of the sheriff's room. Both before and after that I had denied several times that that thing had happened in any way.'

"We cannot help but conclude that any doubt that may have been left in the minds of the jurors by the testimony of the complaining witness must have been removed by the corroborating circumstances, by the improbabilities and inconsistencies in the appellant's account of his admitted trip with the boy, and by his conduct when brought into the presence of the boy after his arrest. The verdict is amply supported by evidence the credibility of which was for the jury and not to be determined as a matter of law. While

there is an element of improbability in connection with the use of a gun in so public a place and with the failure of the boy to call for help, there is some corroborating evidence and it cannot be held that the incident is so impossible that the jury could not have believed it occurred, especially when considered in connection with the entire evidence. Since the sentences were made concurrent, no additional prejudice has resulted and the evidence is sufficient to support the verdict in its entirety.

■ "It is next contended that the court erred in permitting certain questions to be asked of the appellant while on the witness stand with reference to a conversation between him and Newman which occurred the week before, while they were on the trip in search of a homestead. The appellant had testified in chief as to certain things that were said in this conversation and, on cross-examination, the court permitted more of the conversation to be brought out. Not only does no error appear, but the court sustained an objection to some of the questions asked and the matters permitted to be received in evidence could not reasonably be expected to have affected the result.

■ "Error is assigned in the admission of evidence of a conversation between the wife of the appellant and the father of the complaining witness which occurred on the night after the appellant was arrested, in which the wife of the appellant asked the father of the complaining witness to drop the charges and intimated that the family of the appellant would take care of him by putting him into an asylum, or in some other manner, so that he could not further molest the boy. The witness testified that she had talked over the matter referred to in the conversation with the whole family, which would naturally include her husband. In any event, the evidence was received only as affecting the interest or bias of the witness and the court fully instructed the jury that the evidence was not received for the purpose of determining the opinion of the witness in the matter nor for the purpose of showing the truth of the particular facts stated in the conversation, but that it was limited to the matter of interest or bias which the witness might have in the case and that it was to be considered by them only for that purpose and only as affecting the credibility of the witness. We are of the opinion that the evidence was admis-

sible for the limited purpose stated. (*People* v. *Mack*, 14 Cal. App. 12 [110 Pac. 967]; *People* v. *Lee Ah Chuck*, 66 Cal. 662 [6 Pac. 859]; *People* v. *Wong Chuey*, 117 Cal. 624 [49 Pac. 833].) It may be added that if the court's ruling were to be held erroneous it could not be held sufficiently prejudicial to require a reversal after a reading of the entire evidence.

██ "The only other point raised is a claim of prejudicial misconduct on the part of the district attorney during his argument to the jury. Most of the matters complained of were well within the freedom of argument permitted under established rules. In others, the court instructed the jury to disregard the statements made. Nothing in this regard approaching reversible error is brought to our attention."

The judgment and order appealed from are affirmed.

Shenk, J., Waste, C. J., Preston, J., and Curtis, J., concurred.