[Crim. No. 445. Fourth Appellate District.—October 3, 1939.]

THE PEOPLE, Respondent, v. FREDDIE WHITE et al., Defendants; JAKE COHEN, Appellant.

Lee Nuffer for Appellant.

Earl Warren, Attorney-General, Eugene M. Elson, Deputy Attorney-General, and Elmer W. Heald, District Attorney, for Respondent.

GRIFFIN, J.—The appellant Jake Cohen with two others were indicted by the grand jury of Imperial County in count one of the indictment of the offense of grand theft, charging

that they, Jake Cohen, Freddie White and Albert E. Love, on or about September 5, 1938, in that county, wilfully, etc., took eleven head of bovine animals, the property of one John Bulloni. In count two thereof, appellant was charged, along with the two other persons named, with conspiracy to commit grand theft in the same particulars.

Prior to trial, the case against the defendant Love was transferred to the juvenile court for further proceedings, in view of the fact that he was a minor. The defendant White withdrew his plea of not guilty and pleaded guilty to counts one and two of the indictment, and the trial thereafter proceeded as against the appellant Jake Cohen alone. Both of these defendants thereafter testified for the prosecution and against the appellant.

Trial by jury was had and a verdict was returned by the jury finding Jake Cohen guilty as charged in both counts of the indictment. Motion for a new trial was made and denied. Notice of appeal was given from the order denying the motion for new trial and from the judgment.

Briefly, the grounds of appeal as argued in appellant's opening brief are (1) alleged insufficiency of the evidence to support the judgment in that the testimony of the alleged accomplices was not corroborated and was unworthy of belief and inherently improbable; (2) alleged error by the court in giving certain instructions.

During the months of July, August and September, 1938, John Bulloni lived on a ranch west of the city of Imperial and west of New River, and was engaged in the business of operating a dairy. He owned about 225 head of stock. The defendants Freddie White and Albert E. Love started working for him as milkers on June 23, 1938, and on the same day John Bulloni went to the hospital and was there 12 days. Between the 15th and 20th days of August, 1938, Bulloni missed one white Jersey and 12 or 15 head of Holstein heifers; these heifers were around 16 to 18 months old and were marked with an ''underbit'' on the left ear. All of the heifers had been raised by Bulloni.

The defendant White testified that he had known appellant Cohen since 1937; that Cohen came to the Bulloni ranch several times during the summer of 1938 while White was employed as a milker and he knew that appellant had bought livestock on several occasions from Bulloni; that during the time Bulloni was in the hospital appellant came to the ranch

and was informed by him that Bulloni was in the hospital; that at that time appellant suggested to him that he, White, could sell a number of Bulloni's heifers and cows and that Bulloni would never know it; that from that time on, White had several conversations with appellant Cohen about getting some of Bulloni's heifers, and during the month of August, White and Love drove several head of Bulloni's heifers over to Macie Ferguson's ranch at the suggestion of appellant, where they were kept for about one month. Macie Ferguson testified that White paid him $5 for the pasturage of 13 head of bovine animals. White further testified that on September 20, 1938, the cattle were removed by White and Love to a place along the east side of New River and left in the shade of some trees near an old deserted ranch located near a basin or bottom land cut out by the New River and containing approximately 40 acres; that he did not see the cattle again until two days afterward, when he saw them down in the basin about 300 yards from where he had left them; that while the cattle were in the basin and within two or three days following September 20, 1938, White saw appellant Cohen at Bulloni's ranch and told appellant that the heifers were in the basin, at which time appellant stated he would send a truck for them. Subsequently the cattle were hauled out of the basin by one Estrada, in response to orders given by the appellant Cohen. White then stated that he, soon thereafter, saw appellant in El Centro, and appellant asked him if Estrada had obtained the heifers; that White informed him that he had, at which time appellant then told White he would give him one-half of the sale price.

White testified that he had seven separate conversations with Cohen concerning the money from the sale of the cattle, after the cattle had been taken to Los Angeles and there sold by appellant. In the last conversation appellant advised White that he was broke and did not have any money. White, according to his testimony, never received any money from appellant for the sale of the cattle. After White discontinued working for Bulloni, he worked off and on for about a month helping Cohen load calves, for which he received $15.

Fred Estrada, who resided in El Centro and was in the trucking business, testified that he was acquainted with and

knew Freddie White, John Bulloni, and appellant Jake Cohen; that he had a one and a half ton Chevrolet truck equipped for hauling livestock; that at some time between the 25th day of September and October 1, 1938,.he saw Cohen in El Centro and he directed him to go out toward John Bulloni's ranch just east of New River and that in a basin north of the road he would find Freddie White, and for him to load up some cattle there and bring them to his (appellant's) corral on the Bradshaw ranch. Estrada went to the place as directed and there met Freddie White and Eddie White, his brother. He loaded 11 bovine animals, consisting of heifers, and when coming out of the river bottom basin his truck became stuck and he had to unload the cattle and be pulled out by a tractor. The following day between 1 and 4 o'clock P. M. he returned to the basin along New River and with the assistance of Freddie and Eddie White, again loaded the cattle, and brought them to Bradshaw's corral located four miles southeast of El Centro, where appellant had rented space, and unloaded the cattle. Appellant Cohen was the party who directed him to the place where the cattle were located and paid Estrada for the hauling.

Henry Shroyer, who lived in Calexico and was engaged in the business of trucking for Carsten Trucking Company during the year 1938, testified he knew appellant Cohen; that on Sunday, October 2, 1938, he hauled a load of 32 head of cattle from the Bradshaw corral for appellant Cohen to Washburn and Condon, livestock commission merchants in Los Angeles; that he had two copies of livestock brand inspection certificates and that he checked through the Trifolium Checking Station at 4:40 P. M., October 2, 1938, with 32 head of cattle from the Imperial Cattle Company, owned by J. D. (appellant) and Harry Cohen.

E. B. Manley testified that he was a brand inspector for the State of California; that on Sunday, October 2, 1938, he inspected 32 head of cattle for appellant at the Bradshaw corral, included within which were 9 unbranded heifers; that on October 3d and 4th, 1938, the shipment of cattle brought in by truck by Henry Shroyer were sold by Washburn and Condon for appellant Jake Cohen; that these nine heifers brought $287.12, and that appellant did not actually receive this sum of money, but that this sum was credited to his account.

Albert Love, one of the defendants, testified that while he was working at Bulloni's ranch, he saw the appellant there on several occasions, six or seven times, and on one occasion, he overheard part of a conversation ensuing between Freddie White and appellant and he heard appellant Cohen ask White if he wanted to sell some cattle; that at that time Freddie White did not own any cattle; that while he was employed there and during Mr. Bulloni's absence, he and Freddie White, on horseback, moved a number of heifers from the Bulloni ranch and that he was asked by Freddie White to assist him in the moving of them; that approximately 11 heifers were moved and that they started moving them around 6:30 P. M. and moved them to Macie Ferguson's ranch about three or four miles distant; that when they arrived at the Ferguson ranch they took them down into a little gulch and alongside of a little river.

John Bulloni described the missing cattle and testified that after he missed the stock he asked appellant if he (Cohen) had seen any small Holstein heifers and Cohen replied that he had not. Bulloni also testified that on a previous occasion he sold several head of cattle to Cohen. Some of them were earmarked in the same manner as the missing cattle were earmarked.

Alfred Soule testified that he knew the defendant Freddie White and that he resided on the bank of the New River; that on or about September 20, 1938, he saw a number of Holstein heifers being driven by Freddie White and another man; that Freddie White and the other man were on horseback and that they were driving the cattle in a southerly direction.

Appellant took the witness stand and testified in his own behalf. He stated that in the latter part of September or early part of October he purchased 11 head of yearling Holstein heifers from Freddie White; that he went out near the Ferguson ranch when White and Love were not present and looked the heifers over and agreed to pay White $15 per head; that he sent Fred Estrada to get the cattle; that he himself took these particular cattle to Los Angeles and sold them; that he knew Freddie White for some time; that he knew White worked as a milker for Bulloni off and on for two years and had talked to him on several occasions at the Bulloni ranch; that appellant did not know that White owned

any cattle and made no other inquiry about the ownership of the eleven head of cattle other than to obtain a bill of sale from him and pay him the sum of $165; that about a week prior to the time appellant obtained the eleven head of heifers from White he purchased eight cows and one bull from Bulloni, paying $550, and that they were sold by Washburn and Condon on September 20, 1938, in Los Angeles. He admitted that E. B. Manley, the brand inspector, inspected all of appellant's cattle; that appellant did not know whether Inspector Manley asked for a bill of sale for the cattle shipped from Bradshaw's corral on October 2, 1938, or not. Appellant testified that White gave him a bill of sale for the cattle; that his room had been ransacked while he was in jail; that after he was released, he stepped into the lavatory of his room and there were some bills of sale in the lavatory and he picked them out. On direct examination appellant was shown several scraps of paper which he stated he retrieved from the toilet and which he identified as comprising the parts of the bill of sale given to him by Freddie White. He stated that he did not know whether the bill of sale was for the heifers in question. However, there was no evidence of any character that he had, at any time, any other transaction with Freddie White.

On cross-examination appellant was shown the scraps of paper just referred to. They were fitted together before him and he identified the fitted parts. Instead of the pieces comprising one bill of sale from Freddie White, they comprised three bills of sale, two entirely unrelated to the transaction in question and neither bearing White's signature, and the third was a blank bill of sale with no writing thereon.

■ It has long been the rule that possession of stolen property by a defendant, however soon after the crime was committed, is not in itself sufficient evidence on which to base a verdict of guilty to the charge of grand theft. However, should the defendant make an explanation as to the manner in which he came into possession of such property, the question as to whether he is telling the truth in that regard rests solely with the jury. In *People* v. *McClain,* 115 Cal. App. 505, 508 [1 Pac. (2d) 1085], the court said:

"The weight to be given to the testimony was for the jury to decide; but when money is stolen, proof that a part of it, on the following day, was found on the person of another in the vicinity, certainly tends, when not satisfactorily ex-

plained, to raise a presumption that he is the guilty party; *and if an explanation is attempted by the accused, it is for the jury to judge of its truth and plausibility.* (Italics ours.) The corroborating evidence may be slight, and entitled to but little consideration; nevertheless, the requirements of the statute are fulfilled if there be *any* corroborating evidence which, *of itself,* tends to connect the accused with the commission of the offense."

To the same effect is the case of *People* v. *Taylor,* 4 Cal. App. (2d) 214, 217, 218 [40 Pac. (2d) 870], also, *People* v. *Ojeda,* 132 Cal. App. 593, 596 [23 Pac. (2d) 316], and *People* v. *Negra,* 208 Cal. 64 [280 Pac. 354]. There is evidence in the instant case which disputes and contradicts the testimony of the accomplices on material issues. The testimony of the accomplices was impeached by showing that they made different statements on other occasions respecting some facts related at the trial. The testimony of the accomplice Freddie White that he, himself, admittedly took two of the calves from the herd, driven to the Ferguson ranch, and sold them to a Gene Houck, and at the same time asked him if he wanted to buy some more heifers and suggested that he go out and look at them on the Ferguson ranch, tends to negative his story that he had previously arranged with appellant to drive the cattle from the Bulloni ranch and share with appellant in the proceeds of the sale. However, this may be explained by the fact that appellant failed to haul the cattle away from the Ferguson ranch. During this period Ferguson was pressing White to remove the cattle because he, Ferguson, was becoming suspicious of the ownership of them. White claims that he had told Ferguson that they were stolen. The jury was apparently convinced of the truth of the charges, notwithstanding these inconsistencies.

It is well settled that improbability of testimony must amount to incredibility and must very clearly appear, in order to justify a reversal. (*People* v. *Dorland,* 2 Cal. (2d) 235 [40 Pac. (2d) 474].) Where a conflict appears in the evidence an appellate tribunal is powerless to overthrow a verdict adverse to the appellant provided there is substantial evidence to sustain the judgment. (*People* v. *Murieta,* 1 Cal. App. (2d) 727 [37 Pac. (2d) 158].)

There is, of course, no dispute respecting the provisions of section 1111 of the Penal Code that the testimony of the accomplices must be corroborated and in the absence

of any such corroboration a conviction may not stand. The difficulty comes in determining what corroboration is sufficient. First, we must eliminate from the case the evidence of the accomplice, and then examine the evidence of the remaining witness or witnesses with the view to ascertain if there be inculpatory evidence,—evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated; if there is no *inculpatory* evidence, there is no corroboration, though the accomplice may be corroborated in regard to any number of facts sworn to by him. (*People* v. *Kazatsky*, 18 Cal. App. (2d) 105, 110 [63 Pac. (2d) 299]; *People* v. *Morton*, 139 Cal. 719 [73 Pac. 609]; *People* v. *Davis*, 210 Cal. 540 [293 Pac. 32]; *People* v. *Kempley*, 205 Cal. 441 [271 Pac. 478].)

Defendants White and Love, admittedly accomplices, testified in substance that they were approached by appellant to steal a number of Holstein heifers belonging to Bulloni; that they consented thereto and that appellant suggested that White and Love drive the heifers to the ranch of Macie Ferguson. The testimony of Macie Ferguson corroborated this fact to this extent, that the heifers were driven to his ranch by White and Love, which is undenied. That White and Love intended to and did steal the cattle is uncontradicted. Appellant, by his own admission, was at the Bulloni ranch talking to White and Love on many occasions during the period of their employment. He was quite familiar with the surrounding premises, also the number, weight, and earmarkings of all of Bulloni's cattle. The fact that the heifers taken by Cohen under the circumstances here related from the Ferguson ranch were earmarked in the manner that would identify them as Bulloni's cattle (which special earmark was known to appellant) appears to us would be a circumstance indicating guilty knowledge, and sufficient to cause appellant to become most suspicious, at least, of White's claimed ownership. Appellant denied knowing of any missing heifers from Bulloni's ranch when questioned by him. It is also quite apparent that appellant never obtained a bill of sale from White, as was his custom, for the sale of the cattle. Appellant's knowledge of the location of the cattle and his ability to identify them on the Ferguson ranch without assistance from White or Love, was likewise a circumstance that must be considered. These circumstances in themselves, when considered in connection with the appar-

ently false explanation by appellant in accounting for his possession of the stolen cattle by attempting to produce a bill of sale (not signed by White) which proved to have nothing whatever to do with the transaction, seem to us, if believed by the jury, would meet the necessary requirements under the rule above stated, as constituting inculpatory evidence independent of the testimony of the accomplices.

Appellant next complains of the people's usual instruction given, covering the act of aiding and abetting (sec. 971, Pen. Code) and argues that it may be applicable to the offense of grand theft, but is inapplicable to the conspiracy count. From the record it appears that the jury was fully and properly instructed as to the law applicable to the conspiracy count. Considering the instructions together, they may be read in complete harmony. This same statement and conclusion may well apply to the same claimed error in giving the usual instruction on the distinction between circumstantial evidence and direct or positive testimony, and the instruction which was properly given relating to the testimony of accomplices under section 1111, Penal Code.

The next instruction about which complaint is made reads as follows:

"You are instructed that the formation and existence of a criminal conspiracy is one of the classes of facts which can seldom be established by direct evidence. In the very nature of the case, such common design can rarely be shown by direct evidence and can only be shown by circumstantial evidence; and, therefore, a finding of the formation and existence of such a conspiracy may stand upon circumstantial evidence only, if, upon the whole of such evidence, the jury is satisfied, beyond a reasonable doubt, of the formation and existence of the said conspiracy. Therefore, in determining the question of the formation and existence of a conspiracy, it is proper to take into consideration the relation of the parties to one another if any, their personal and business associations with each other, and any and all facts in evidence which may tend to show what transpired between them at or before the time of the alleged combination or agreement, or which tended to show what transpired between them, as well as the acts performed *and the declarations made by each party subsequent to such alleged combination or agreement,* in respect to and in pursuance and furtherance of the alleged conspiracy; *and from these facts and circumstances*

*you may determine whether a combination or agreement did in fact exist and whether the same was illegal in its inception, or became illegal at any subsequent time.* The purpose of the combination is usually known only to those who enter it, and their guilt can generally be proved only by circumstantial evidence. The common design is the essence of the fact, and this may be shown by the steady pursuit of the alleged conspirators of the same object, whether they act separately or together, or by the same or different means, provided all lead to the same unlawful result.''

The portion italicized, it is argued, in effect told the jury that they could consider the testimony of the accomplices in determining whether a combination in fact existed and whether the same was illegal in its. inception, without stating to the jury that their testimony to that effect must be corroborated by other evidence. It is also contended that the instruction was too general. An instruction in the language of section 1111 of the Penal Code and other instructions relating to the question of the necessity of the corroboration of the testimony of accomplices were fully and fairly stated and given. The questioned instruction must be read in connection with other instructions on the subject. It was not necessary for the court each time that it gave an instruction to repeat the necessity of the corroboration of the accomplices' testimony. It is sufficient if the charge as a whole fairly covers all that is pertinent to the case and is stated consistently and harmoniously. (*People* v. *Brittan*, 118 Cal. 409 [50 Pac. 664]; *People* v. *Wagner*, 65 Cal. App. 704 [225 Pac. 464].)

■ However, this instruction, in reference to the conspiracy count, when read alone, may ·have indicated to the jury that they were authorized to take into consideration ''declarations made by each party (coconspirator) subsequent to such alleged combination or agreement. . . . ''. This instruction should have been amplified to the extent that where the evidence as a whole, if believed, is amply sufficient to establish a conspiracy, all statements, acts and declarations by any of the parties pending the commission of the crime, looking towards its consummation, are competent evidence against each and every conspirator. ■ The rule allowing statements or declarations of one conspirator to be given in evidence as against his coconspirator requires not only

that the conspiracy be pending and its object not consummated when the statements or declarations are made, but also that such statements, in order to be admissible, must be in aid and furtherance of the common purpose or design of the conspiracy; and declarations made by such a coconspirator out of the presence of the defendant on trial, after the crime has been committed, are hearsay and inadmissible. (*People* v. *Oldham,* 111 Cal. 648 [44 Pac. 312]; *People* v. *Ayhens,* 16 Cal. App. 618 [117 Pac. 789]; *Del Campo* v. *Camarillo,* 154 Cal. 647 [98 Pac. 1049]; *People* v. *Smith,* 151 Cal. 619 [91 Pac. 511]; *People* v. *Lovren,* 119 Cal. 88 [51 Pac. 22, 638]; 5 Cal. Jur., sec 27, p. 525.) If the failure to amplify the questioned instruction was error, this error would not constitute ground for the reversal of the judgment. The court gave another instruction on the subject which was applicable and covered the evidence produced at the trial.

The judgment and order denying the motion for a new trial are affirmed.

Barnard, P. J., and Marks, J., concurred.