[Crim. No. 4368.   In Bank.   Apr. 30, 1942.]

THE PEOPLE, Respondent, v. BARZEN HOYT et al., Appellants.

Henry J. Kleefisch for Appellant Hoyt.

Belli & Leahy and Melvin M. Belli for Appellant Tosi.

Raine Ewell for Appellants Arnold and Frazier.

Earl Warren, Attorney General, and David K. Lener and Ward Sullivan, Deputies Attorney General, for Respondent.

THE COURT.—An indictment containing three counts jointly charged the defendants Barzen Hoyt, Delmar Arnold, James Lacey, Arthur Frazier and Sylvio Tosi with conspiracy to commit robbery, robbery, and murder. Each was also charged with a prior conviction of felony. Demurrers were interposed alleging that more than one offense was charged, that it did not appear that the offenses were connected in their commission, and that they were not offenses of the same class. Upon motion, the indictment was permitted to be amended on its face by adding to counts two and three, ''and said acts and crimes were connected together in their commission.'' Thereupon the demurrers were overruled, and to each count as amended the defendants pleaded not guilty. Hoyt, Lacey and Tosi also admitted a prior conviction as charged, but Arnold and Frazier denied the accusation. At the inception of the trial, Lacey changed his plea to one of guilty and testified as a witness for the prosecution. The jury found Hoyt, Arnold, Frazier and Tosi guilty as charged. Accordingly, they have been sentenced to imprisonment on the first and second counts, and to death on the third count, the verdict referable to the latter count being without recommendation. From the judgments and order denying a new trial they have prosecuted this appeal.

Section 954 of the Penal Code permits the statement in separate counts of ''two or more different offenses connected together in their commission. . . .'' The indictment as amended alleged the sequence and interconnection of the crimes charged. The amendment was authorized by section 1008 of the Penal Code. As stated in *People* v. *Mareck,* 17 Cal. App. (2d) 278, 280 [61 P. (2d) 972], ''No change was made in the character of the crimes charged, the purpose and effect of the amendment being to set forth in specific terms that the various offenses were all connected with their commission and were part of the same act.''

Lacey's testimony may be summarized as follows: On October 28, 1940, at about 4 o'clock p. m., Lacey, Arnold and Frazier called upon Tosi at his soda fountain and grocery store in San Francisco. Tosi knew Arnold and Lacey but not Frazier. Shortly after they arrived at the store, a boy about fifteen years of age entered, went to the rear counter (where Lacey and his companions were sitting) and ordered a sandwich from Tosi. The boy, according to Lacey, then moved to the front of the store as directed by Tosi because "he [Tosi] had some business to talk." The four men resumed their discussion. Following Lacey's inquiry as to the possibility of robbing some "worthwhile" place in the neighborhood and the rejection of Tosi's recommendation of a bank "at the corner" because it "would be too tough," Tosi suggested the Ferrari grocery store a few blocks away, where the proprietor always kept considerable money on hand—at least four or five hundred dollars. About thirty minutes later, Lacey, Arnold and Frazier left, stating they would return that evening at 8 o'clock. The three then went in Lacey's automobile to "case" the Ferrari store and after agreeing that it "looked all right," they left to discuss their plans further in Arnold's hotel room. En route they had some drinks, and Frazier persuaded the others that they needed a "tough guy," "a fellow who has a lot of nerve and would go all the way," to help. After leaving Arnold, Lacey drove Frazier to the latter's residence, where Frazier found Hoyt and introduced him to Lacey as the needed "tough guy." They then returned to Arnold's room, where Hoyt met Arnold for the first time, and the four conversed before again proceeding to Tosi's store.

When they arrived at Tosi's store at approximately 8:30 p. m., a woman (Anne Beidenbach) was talking to Tosi. She was joined by a man (James Quine, her brother) and the two entered into a political discussion. Lacey and his three companions sat at one of the counters near the front of the store. Lacey introduced Hoyt to Tosi, who thereupon served the four with food and drink, reviewed with them the arrangements and invited them to return after they had "pulled the job." At about 8:50 o'clock p. m. the four left, Hoyt stopping to pin a campaign button on the dress of the Beindenbach woman. The man (identified as her brother) already had left the premises.

Hoyt, Lacey, Arnold and Frazier proceeded to the Ferrari store. They agreed that Lacey should remain in the auto-

mobile, Frazier should act as the "lookout," and Hoyt and Arnold should enter the store. They parked the car about half a block away and waited some minutes until three men who were at the store had departed. At approximately 9 p. m., Hoyt and Arnold entered, and Frazier and Lacey assumed their posts. A short time later, Hoyt and Arnold returned to the car, where Lacey and Frazier were waiting, and Hoyt said, "Let's get out of here quick." Lacey wanted to return to Tosi's store, but Hoyt and Arnold demurred, saying they wanted "to clean up," adding that Ferrari had put up such a battle they had to hit him repeatedly on the head—Hoyt with a blackjack and Arnold with the butt of his pistol—with the result that Ferrari bled profusely, spattering their clothes.

Lacey drove to a nearby oil station, where Hoyt and Arnold "cleaned up." The four returned to downtown San Francisco, Hoyt and Arnold meanwhile complaining about the "bum steer" Tosi had given them on the money to be found at the Ferrari store, as they had only secured $53 and a check. Lacey drove to Hoyt's hotel, where Hoyt and Arnold changed their clothes and rejoined the other two. The four left for Sacramento, where they stayed that night. The next day they drove to Portland, Oregon, where they remained until October 31, 1940, when they returned to San Francisco.

The robbery victim, David Ferrari, died twenty-four hours after the assault from the effect of blows upon his head. After Hoyt, Lacey, Arnold and Frazier returned from Portland, Oregon, Hoyt and Frazier left San Francisco for the southern part of the state—Hoyt going to Long Beach, where he was later apprehended by the police, and Frazier going to Los Angeles, where he was subsequently arrested. Arnold was ultimately located by the police in Reno, and after making a statement he was returned to San Francisco. Lacey was arrested in Oakland. Tosi did not leave the city, but remained at his store until placed under arrest. The several arrests occurred at various times during the first two weeks of November, 1940.

All four appellants challenge the sufficiency of the evidence, contending that the verdicts rest upon the uncorroborated testimony of Lacey, the prosecution's principal witness, and by his own admission an accomplice. Section 1111 of the Penal Code provides that "A conviction cannot be had upon

the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." *People* v. *Yeager*, 194 Cal. 452, 473 [229 Pac. 40], states that "to corroborate an accomplice the evidence need not establish the actual commission of the offense, nor extend to every fact and detail covered by the statements of the accomplice, or to all the elements of the offense, nor prove that the accomplice has told the truth. The corroborative evidence must tend in some slight degree, at least, to implicate the defendant. While it need not be strong, more is required by way of corroboration than mere suspicion. It is sufficient if the corroborating evidence tends to connect the defendant with the commission of the offense, though if it stood alone it would be entitled to little weight."

It is settled in this state, however, that the corroborative evidence is insufficient if it "takes direction and tends to connect the appellant with the offenses charged only when interpreted by and when read in conjunction with the testimony of the admitted accomplice." (*People* v. *Shaw*, 17 Cal. (2d) 778, 800-809 [112 P. (2d) 241]; see, also, *People* v. *Davis*, 210 Cal. 540 [293 Pac. 32]; *People* v. *Kempley*, 205 Cal. 441, 456 [271 Pac. 478]; *People* v. *Morton*, 139 Cal. 719, 724 [73 Pac. 609]; *People* v. *White*, 35 Cal. App. (2d) 61, 69 [94 P. (2d) 617].) The recent Shaw case, *supra*, 803, quotes with approval the following from the Morton case, *supra*, 724: "Eliminate from the case the evidence of the accomplice, and then examine the evidence of the other witness or witnesses with the view to ascertain if there be any inculpatory evidence—evidence tending to connect the defendant with the offense. If there is, the accomplice is corroborated; if there is no *inculpatory* evidence, there is no corroboration, though the accomplice may be corroborated in regard to any number of facts sworn to by him."

Tested by the rule as announced and applied in the foregoing cases, our examination of the record herein discloses that there is ample evidence corroborative of the accomplice Lacey tending to connect Hoyt, Arnold and Frazier with the commission of the offenses of which they stand convicted. Applying the same test, we are equally satisfied, however, that there is no adequate corroborative evidence tending to connect Tosi with the offenses.

Directing attention first to the corroborative evidence tending to connect Hoyt, Arnold and Frazier with the crime, reference need only be made to the fact that they were seen together and with Lacey not only prior to but immediately after commission of the offenses. The oil station attendant testified to the visit of the three, with Lacey, to his station and to their use of the washroom. Lacey's testimony that he then drove the others to Hoyt's hotel in downtown San Francisco, where Hoyt and Arnold changed their blood-spattered clothes, was corroborated by one Stalcup, Hoyt's roommate. This witness testified that he was awakened about 10:30 o'clock on the night of October 28, 1940, when Hoyt and Arnold entered the room; that Hoyt told of the grocery store holdup on San Bruno Avenue and of the proprietor's resistance, necessitating Hoyt's bludgeoning of the grocer with the blackjack; that he gave Hoyt and Arnold some clothing; and that the clothes left in the room were blood-stained. Stalcup also identified the blackjack, which had been put in evidence, as one he had seen Hoyt making in their room prior to October 28th.

The pathologist for the coroner testified that his examination of the blackjack and the gun, the latter having been deposited in a "hock shop" by Arnold subsequent to the crimes, were marked with human blood in sufficient quantity to be placed within a blood group, which classification corresponded with that of the deceased's blood. The autopsy surgeon testified that the short, ragged lacerations found on deceased's head were caused by blunt instruments of the type of the blackjack and gun in evidence.

It is significant, too, that Hoyt, Arnold, Frazier and also Lacey fled from San Francisco on the night of the robbery. ■ Flight is a factor tending to connect an accused with commission of an offense. (*People* v. *Mazzola,* 99 Cal. App. 682, 685 [279 Pac. 211]; *People* v. *Nikolich,* 93 Cal. App. 356, 358 [269 Pac. 721]; see other authorities in 8 Cal. Jur. 180, sec. 257.) The corroborative circumstance of flight was noted in *People* v. *Rice,* 29 Cal. App. (2d) 614, 620 [85 P. (2d) 215], where it is said that "corroboration need not be by direct evidence, but the entire conduct of the defendant may be looked to for corroborating circumstances and if, from those circumstances, his connection with the crime may be fairly inferred, the corroboration is sufficient."

314

█ Subsequent to arrest, Hoyt, Arnold and Frazier each signed a written statement confessing his guilt and detailing his part in the crimes. Such statements also serve to corroborate the testimony of the accomplice Lacey. In *People* v. *Frazer,* 80 Cal. App. 464, 468 [252 Pac. 633], it is said that "the *corpus delicti* may be sufficiently proven by the testimony of an accomplice to warrant the introduction of admissions or confessions of the defendant." █ The free and voluntary nature of the statements was testified to by the police officers present when they were taken. Hoyt's challenge that his statement or confession was improperly admitted in evidence because initially he was not apprised of his right to counsel, of his right to remain silent if he desired, and that his statements could be used against him, lacks merit. The contention is answered in *People* v. *Booth,* 72 Cal. App. 160 [236 Pac. 987], and in *People* v. *Ramirez,* 113 Cal. App. 204 [298 Pac. 60], wherein it is held that such matters do not render the statement involuntary and inadmissible.

█ What has been said establishes that within the settled rule the record abounds in evidence corroborative of the accomplice Lacey and tending to connect Hoyt, Arnold and Frazier with the commission of the crimes.

█ This is not true, however, as to the appellant Tosi. In our opinion, as to him there is no substantial evidence to corroborate the testimony of the accomplice Lacey within the rule announced in the Shaw, Davis, Kempley and Morton cases, *supra.* At no time did Tosi confess his guilt or admit participation in any way in the commission of the offenses. Nor as to him is there any corroborative element of flight present, as with the others charged. Nor do we find corroborative evidence of guilt flowing from any failure on Tosi's part to answer or deny accusatory statements directed at him prior to trial. It appears from the testimony of Officer Corrasa that upon being informed that some of the others had accused him of "putting the finger on the holdup of the Ferrari grocery store," Tosi "denied about being implicated in this here holdup at the grocery store." Officer McCann also testified that Tosi stated to him that he "had nothing to do with it," and "that he was going to get counsel." A deputy district attorney, who talked with the five men prior to presentation of the matter to the grand jury, testified that Tosi repeatedly stated that "I stand on my constitutional rights

that I don't have to answer any questions without the presence of my lawyer."

The testimony of the Spencer boy that on the afternoon of October 28, 1940, he saw three men sitting at the counter in the Tosi store but did not hear any of their conversation, standing alone, does not connect Tosi with the crimes. As pointed out in the Shaw case, *supra*, "without the interpretation and direction furnished by the testimony of the accomplice," the boy's testimony no more tends to connect Tosi with the commission of the crimes than the subsequent appearance of the group at the oil station tends to connect the attendant there with participation therein. In other words, if we "eliminate from the case the evidence of the accomplice," as required by the authorities, so far as Tosi is concerned the presence of the group in his store is as consistent with his innocence as with his guilt.

This is equally true as to the testimony of the man and woman who also saw the group at Tosi's store. Without the interpretation and direction furnished by Lacey's testimony, this asserted corroborative evidence from Tosi's standpoint could as well have described a proper and innocent visit of the group. And, furthermore, the woman (Mrs. Beidenbach), a witness for the prosecution, testified that she was in the store when the group entered; that after serving them coca cola Tosi "left those young men and came over and spoke to me"; that he then went in the kitchen, lit a cigarette and stood in the kitchen door and talked to her; that her brother (James Quine) came in and they "got in a friendly argument on account of politics"; that Tosi stayed in the kitchen door "most all the time that [the men] were in the store"; that Tosi went back where the men were seated, once, she thought, to collect for the coca colas, but that he did not stay or engage in any conversation with them "because she didn't see any of them talking"; that Tosi "didn't stand there and talk to them"; that her brother then left and the other men left about five minutes later; that Tosi "never said goodbye to anybody"; that she stayed in the store for about five minutes after the men left; and that at about 9 p. m., Tosi came upstairs and visited with her and her husband until about 11:45 p. m., listening to the radio.

The only other evidence which it is claimed corroborates the testimony of Lacey is that some time prior to the

robbery the Tosi family had repaid a loan to Ferrari, the deceased, and that an inference may be drawn therefrom that Ferrari, to Tosi's knowledge, possessed money. The mere establishment of the robbery should not tend to connect the former debtor or his family with the crime because they were aware of the creditor's possible possession of the money.

When on the stand in his own defense, Tosi testified that he was on parole from San Quentin; that he worked in his father's store from 7 o'clock in the morning until 9 at night; that Lacey, whom he knew, came to the store on the afternoon of October 28, 1940, with two men whom he did not know, although he thought he had seen one in San Quentin; that he served the group with coca cola and "hot dogs"; that he talked with Lacey alone, of friends and about the approaching election; that the group left in about fifteen minutes; that nothing was said about a return visit and he was surprised when Lacey returned later in the evening with his same two companions (Arnold and Frazier) and with Hoyt, whom Tosi did not know; that he again took their orders and served them; that Mrs. Beidenbach and her brother were in the store at the time and a general discussion of politics ensued; that Ferrari's name was not mentioned during either visit of the men; that they left before Mrs. Beidenbach; and that he shortly thereafter closed the store and went upstairs to listen to the election speeches on the radio. He explained his original denial to a police officer that the group had been at his store on the day mentioned "because Lacey was an ex-convict, and I didn't want to tell him I knew Lacey, and that Lacey was in the store, because that would be violating my parole." It is not at all improbable that his prior conviction and then existing parole status may have prompted Tosi to originally deny knowing or seeing the group on the day of the robbery—though in retrospect the impropriety of such a course is readily apparent. We are of the view, as stated above, that as to Tosi the judgment and order must be reversed because of insufficiency of the evidence, the record being destitute of corroborative evidence within the meaning of the authorities.

There is no merit in the contention that the jury upon returning its verdict on count one exhausted its power to pass upon the remaining two counts, and that by imposing sentence on all three counts the court violated section 13 of article I of the Constitution and section 654 of the Penal Code

relative to placing a person twice in jeopardy and imposing two punishments for one act. The order in which verdicts are read and in which judgments are pronounced is not material. (*People* v. *Degnen*, 70 Cal. App. 567, 577 [234 Pac. 129].) The cited constitutional and code provisions relate to second jeopardy and double punishment for the same offense. (*People* v. *Coltrin*, 5 Cal. (2d) 649, 660 [55 P. (2d) 1161].) The crimes of criminal conspiracy, robbery and murder here involved are separate and distinct offenses. The test is the identity of the offenses as distinguished from the identity of the transactions from which they arise. A defendant may be convicted of two separate offenses arising out of the same transaction when each offense is stated in a separate count and when the two offenses differ in their elements and one is not included in the other. (*People* v. *Martin*, 114 Cal. App. 392 [300 Pac. 130] ; *People* v. *Venable*, 25 Cal. App. (2d) 73, 74 [76 P. (2d) 523].)

Contrary to the appellants' contention, it is now settled in this state that in the absence of a recommendation of life imprisonment in the verdict referable to the murder count, the trial court had no alternative but to impose the death penalty. (*People* v. *Perry*, 14 Cal. (2d) 387, 392 [94 P. (2d) 559, 124 A. L. R. 1123].)

After retiring to deliberate, the jurors returned to court and stated that they desired to know ''If a defendant is convicted of murder in the first degree and given life imprisonment, is he subject to parole?'' The court said: ''You have nothing to do with that.'' One of the jurors then asked for ''a definition of life imprisonment,'' to which the court replied: ''All I can tell you is it is imprisonment in the penitentiary for the period of natural life. *What is done later by the authorities is none of our concern.*'' The appellants urge that the italicized language suggested to the jury that the sentence of life imprisonment would carry with it the possibility of parole and caused the jury to return verdicts of guilty on the murder count without recommendation as to punishment. The court's remarks are not susceptible of the construction assigned to them. The jury was instructed that if it convicted the defendants of murder in the first degree, the law permitted it to fix the penalty at death or life imprisonment, and that should the verdict be ''guilty of murder in the first degree, without any recommendation, the law will impose the death penalty.'' The challenged language did no more than

318

advise the jury that after its assessment of the penalty its duty was ended. The court's remarks were entirely proper. (*People* v. *Ramos,* 3 Cal. (2d) 269, 273 [44 P. (2d) 301]; *People* v. *Bruno,* 49 Cal. App. 372, 376-379 [193 Pac. 511].)

█ Nor do we find anything of a prejudicial character in the conduct of the prosecuting attorney. Many of the matters complained of are trivial and such as frequently occur in the trial of contested cases. Some of the remarks in the closing argument castigated the appellants, singly or as a group, but in so doing counsel cannot be said to have transcended the rules of propriety. Reasonable inferences may be drawn from the evidence by counsel in the course of argument. (*People* v. *Burdg,* 95 Cal. App. 259, 269 [272 Pac. 816].) █ Moreover, the question whether counsel prejudicially overstepped the bounds of propriety is a matter largely within the discretion of the trial court. (*People* v. *Mayes,* 113 Cal. 618, 621-622 [45 Pac. 860]; *People* v. *Hanks,* 35 Cal. App. (2d) 290, 302-303 [95 P. (2d) 478].)

█ The final contention concerns the impanelment of the jury. It is urged that the trial court improperly allowed a departure from the order prescribed by section 1088 of the Penal Code for the exercise of peremptory challenges. The assignment is unavailing in the absence of a showing of prejudice to appellants' substantial rights. (*People* v. *Hickman,* 204 Cal. 470, 481 [268 Pac. 909, 270 Pac. 1117]; *People* v. *Troutman,* 187 Cal. 313, 320 [201 Pac. 928].) █ Certain of the appellants also object to the scope of interrogation pursued by prosecuting counsel in the course of the *voir dire* examination wherein on occasions a prospective juror was asked whether in the event he was "satisfied beyond all reasonable doubt and to a moral certainty that five defendants would be guilty of murder in the first degree," he had "any conscientious scruples against the infliction of the death penalty as to the defendant that didn't actually participate in the killing of Ferrari?" Under the circumstances existing at the time, the query was permissible and an answer in the affirmative furnished sufficient basis for the court's allowance of a challenge for cause. (Penal Code, § 1074, subd. 8.)

What has been said sufficiently disposes of all contentions requiring discussion. From a consideration of the whole record, it is our opinion that as to the appellants Hoyt, Arnold and Frazier, no prejudicial error was committed in the rulings of the court and that all questions of fact involved were submitted to the jury under proper instructions.

For the reasons herein stated, the judgments and the order denying motions for a new trial are affirmed as to appellants Hoyt, Arnold and Frazier. As to the appellant Tosi, the judgment and order denying new trial are reversed.

Appellant Hoyt's petition for a rehearing was denied May 28, 1942.