16125

STATE v. TAYLOR
(49 S. E. (2d) 289)

Messrs. *Joseph B. Clements* and *H. E. Yarborough, Jr.*, of Florence, *for Appellant.*

Mr. *J..Reuben Long, Solicitor,* of Conway, *for Respondent,*

August 31, 1948.

OXNER, Justice.

Appellant, a Negro about thirty years of age, was convicted of rape and a sentence of death by electrocution imposed. The only question raised by the exceptions is whether the Court below erred in refusing a motion for a new trial upon the ground that the evidence was insufficient to support the verdict. There was no motion for a directed verdict.

In studying the record after the case was argued, we concluded there was a serious question as to whether the method pursued by the officers in seeking to aid the prosecutrix in identifying appellant by his voice violated the right guaranteed to him under Article 1, Section 17 of the Constitution, of not being compelled to be a witness against himself. Although there was no objection to this testimony and its admissibility is not challenged by the exceptions, it is well settled that where the death penalty is involved, it is the duty of this Court to examine the record for any errors affecting the substantial rights of the accused, even though not made a ground of appeal. A reargument of the case was ordered to afford counsel an opportunity for discussing the admissibility of the testimony mentioned.

The prosecutrix is a young white woman who lived with her husband and three children near the City of Florence.

Appellant and his wife lived with his brother-in-law in the same vicinity. Both houses are located just off of Turner's Lane, a road leading from the National Cemetery Road to the residence of E. K. Turner. The offense is alleged to have occurred between 10:30 and 11:00 o'clock on the night of August 21, 1946, in a patch of woods close to Turner's Lane. Appellant denied any connection with the crime and one of the major questions in controversy was the ability of the prosecutrix to identify him. She testified that while it was not sufficiently dark to prevent recognition of a person at a short distance, she was so nervous and frightened that she did not look at the face of her assailant and only observed his color, size and clothing. She sought to identify him mainly by his voice.

The Sheriff and several other officers were promptly notified of the crime and arrived at the scene between 11:00 and 12:00 o'clock that night. They immediately commenced a vigorous investigation. The next morning about 7:00 or 8:00 o'clock, the Sheriff arrested appellant at a home in Florence where he was employed as a cook and carried him to the county jail. Several hours later he and three or four other Negro prisoners, who worked as trusties around the court house and jail, were required to line up facing the officers. The prosecutrix was then brought into the room and asked to stand behind them, but was not advised as to the one suspected. Each negro was required to repeat certain words which the prosecutrix had previously stated were used by the person who assaulted her. This procedure was described by Deputy Sheriff Barnes as follows:

"Q. All right, Mr. Barnes, were you down there at the jail when that identification was made down there? A. Yes, sir.

"Q. Tell us what happened down there? A. Well, we put five of them in a lineup and we stood Coker (appellant) between two about the same size men, they were all pretty near the same size.

"Q. Were all five men practically the same size? A. Practically the same size and had them facing me and Mr. Wright and I, myself, questioned them, I made them say over and over, each one of them, the things that he was supposed to have said to her. I made them say it several times."

After this was done, the officers stated to the prosecutrix that if she could identify any one of these Negroes as her assailant to touch him. Deputy Sheriff Barnes and the Sheriff testified that the prosecutrix immediately identified appellant as the person who assaulted her. According to several witnesses for the defense, the prosecutrix first started toward one of the other Negroes but when cautioned by the Sheriff to "be sure you are right," she paused and then placed her hand on appellant.

The testimony of the prosecutrix relating to the occurrence at the jail was as follows: "They told the colored boys to all talk, to say what that boy had told me that night, they made each one of them repeat them words, one by one until everyone had repeated it, but they did talk one by one. So after they had repeated it one by one, I stood right in the center right where I was standing when I came in back of them and I pointed my hand at this same boy and this man here (indicating) told me, he said, 'No, don't point your hand,' said, 'Go and touch him, put your fingers on his back,' and I was afraid even to touch him and they said, 'No, Mrs. Purvis, we want you to touch him.' So I walked just a step or two up to him and punched him in the back and whenever I punched him, they all scattered off and this man turned around and looked me square in the face. I looked him square in the face and he did me, and that is when I recognized him as the one there that night. It was kind of dark, it wasn't a pitch dark night, the moon wasn't shining bright but it was light enough I could see, you know, fairly well.

"Q. You are confident he is the one? A. Oh, yes; and that voice that said them words over and over to me, I would never forget that."

The following is taken from her testimony on cross-examination:

"Q. Why was it that you attempted to identify him without ever looking at his face? You said that after you identified him he turned around and you looked him full in the face but you had already identified him before that? A. Oh, yes I identified him by his voice but after I identified him—

"Q. You weren't afraid to identify him, the identification as far as you were concerned was by the voice and the voice alone? A. Yes, sir  *  *  *  and the height of him and the weight of him."

          \*   \*   \*

"Q. The only identification you have of this boy then is that you recognized his voice? A. Yes, sir.

"Q. And that is the only thing? A. And the height and weight of him and them words he spoke in the jail that morning. It was just as much him as if he was saying them right when it happened because I would never forget it."

          \*   \*   \*

"Q. Then you were going by size more than you were by voice? A. No, the main thing I went by was the voice and he had on a white shirt and tan pants."

The only question which we find it necessary to pass upon is whether it was proper for the officers to compel appellant to repeat some of the expressions alleged to have been used by the person who attacked the prosecutrix for the purpose of enabling her to identify him by his voice. We have, therefore, recited only so much of the testimony as is necessary for a proper understanding of this question.

The privilege against self-incrimination is firmly imbedded in the American system of jurisprudence. A provision similar to that found in our Constitution is

embodied in the Constitution of the United States and of practically all the states. However, the decisions of the courts as to its scope and purpose are widely divergent and often conflicting. It is generally agreed that the constitutional guaranty extends to all testimonial utterances by the accused. We have held that the privilege also covers testimonial compulsion under any circumstances. *State v. Griffin,* 129 S. C. 200, 124 S. E. 81, 82, 35 A. L. R. 1227. It was there stated: "The line of cleaverage is whether the proposed evidence is the testimony of the defendant, or evidence in itself, unaided by any statement of the defendant." The weight of authority is to the effect that the guaranty against self-incrimination has no application to such physical evidentiary circumstances as may be revealed by an open exhibition of the witness' body or by an ordinary observation of his person. Accordingly, it has been held that our constitutional provision is not violated by compelling the defendant in a criminal case to stand up for the purpose of identification. *State v. O'Neal et al.,* 210 S. C. 305, 42 S. E. 2d 523. However, there is quite a diversity of opinion as to the extent to which the accused may be compelled to perform some affirmative act to aid the State in connecting him with the crime.

In *State v. Griffin, supra,* two questions were involved, namely: "(1) Was the testimony of the sheriff admissible, to the effect that he compared the shoe of the defendant with the tracks in the potato patch, and that it fitted, when it appeared that he had forced the defendant to remove her shoe, and made the adjustment himself? (2) Was the testimony of the sheriff admissible, to the effect that he compelled the defendant to put her foot in the track, and that she would not do it in the right way?" In answering the first question in the affirmative, the Court observed: "In the case at bar the defendant was not being treated as a witness; the shoe and the comparison of the shoe with the track were not the testimony of the defendant, but of the sheriff, distinct from anything she may have said or done; the shoe was obtained

from her control without the use of any process against her as a witness; she was not necessary to establish its authenticity, identity, or origin, which facts were established by the testimony of the sheriff." The second question, touching the admissibility of the sheriff's testimony as to compelling the defendant to put her foot in the track and her conduct in doing so, was answered in the negative. The Court said: "If the conformity had been perfect, that fact would have appeared from the enforced conduct of the defendant, clearly testimonial compulsion. If otherwise, as appeared, the inference of guilt from the effort to obliterate the track would have been a legitimate basis of comment; it would have been supplied by the defendant, a clear cut case of testimonial compulsion, as Mr. Wigmore aptly terms it."

We have never had occasion, so far as we are aware, to pass upon the precise question before us. In Wigmore on Evidence, 2nd Ed., Vol. 4, Sec. 2265, page 878, the author states that requiring a defendant "to speak words for identification of his voice is no more than requiring the revelation of a physical mark", and is not within the privilege. In the first edition of this work, however, it is said (Volume 4, section 2265, page 3129) that requiring "an utterance of voice for identification" is "perhaps safely within the line of protection." We have found only two cases in which the admissibility of this class of testimony was discussed.

In *Johnson v. Commonwealth*, 115 Pa. St. 369, 9 A. 78, 81, a defendant charged with murder was called upon during the trial to stand up and repeat aloud certain words used by the murderer on the night of the homicide, so as to assist a witness on the stand in forming an opinion as to the defendant's identity. The exception relating to this procedure was dismissed upon the ground that the request was promptly acceded to without any objection either by the defendant or his counsel. While stating that it was not the purpose of the Court to pass upon the question until properly presented, the writer of the opinion observed: "The sole object of the

request was to afford the witness, Mrs. Sharpless, then on the stand, an opportunity of seeing the prisoner, and hearing the sound of his voice, so that she might more intelligently testify whether he was or was not the man by whom she was confronted on the night in question. To hold that this was a violation of the clause in section 9 of the declaration of rights, which declares the accused 'cannot be compelled to give evidence against himself,' would, in my judgment, be a strained construction of that instrument."

In *Beachem v. State,* 144 Tex. Crim. R. 272, 162 S. W. 2d 706, 709, the defendant was charged with robbery. The offense occurred shortly after midnight. The robber was partially disguised by a handkerchief about his face. After defendant was arrested and placed in the city jail, a witness present at the scene of the crime was carried to the jail for the purpose of determining whether or not she could identify him as the robber. She was unable to do so without hearing his voice. She instructed the officers to have the defendant repeat certain words. The officers did so. After the defendant had repeated the words, the witness, by reason thereof was able to identify him as the robber. It was held that this requirement violated the constitutional provision of that State against self-incrimination. The Court stated: "The determining factor in this case is whether the evidence which incriminates the accused was produced by him or by the officers." In an opinion refusing a petition for a rehearing, the Court said: "There is no doubt that it was not improper for witness to inspect appellant and, if she could do so, identify him from his appearance, and his 'voice' as well, if heard in a conversation in which words were not put in his mouth at her suggestion, and he required to repeat them."

The subject of self-incrimination is exhaustively annotated in 171 A. L. R., beginning on page 1144. The Pennsylvania and Texas cases mentioned are reviewed on page 1177.

We think the question before us is controlled by the principles stated by this Court in *State v. Griffin, supra.* It

is difficult to draw any distinction between compelling a defendant to put his foot in a track at the scene of the crime in order to afford a basis for comparison and requiring a defendant to repeat certain words used at the scene of the crime in order to establish a basis for identity.

It must be conceded that any testimony tending to establish the identity of appellant based on utterances voluntarily made by him would be competent. We need not pass upon a situation where an accused is merely compelled to speak for the purpose of identification and there is no compulsion as to subject or words to be used. Assuming, without deciding, that such testimony would be admissible on the same theory as requiring an accused to reveal any physical characteristic, the procedure followed here went much further. Appellant was required to repeat certain words which the prosecutrix says were used by the person who assaulted her. The effect of this was to require him to partially re-enact the scene. The conclusion of the prosecutrix as to appellant's identity was based in part at least on the enforced conduct of the defendant.

We conclude that the testimony as to identity based on the enforced repetition by appellant of words alleged to have been used at the scene of the crime was inadmissible and highly prejudicial. If timely objection had been made to this testimony, it may be that the State would have offered other testimony on the question of identity or sought to identify appellant by other means. We cannot anticipate what testimony may be produced at another trial and its sufficiency can only be determined after it has been offered.

Judgment reversed and new trial granted.

BAKER, C. J., and FISHBURNE, STUKES and TAYLOR, JJ., concur.