16980

THE STATE, Respondent, v. JOHN SAMUEL GREEN, Appellant
(86 S. E. (2d) 598)

2

*Messrs. Harold R. Boulware* and *Lincoln C. Jenkins, Jr.,* of Columbia, and *Herbert O. Reid, Counsel, for Appellant,*

*T. Pou Taylor, Esq., Solicitor,* of Columbia, *for Respondent.*

March 16, 1955.

LEGGE, ·*Justice.*

At the September, 1953, term of the Court of General Sessions for Richland County, appellant was convicted of rape and thereupon sentenced to death. His appeal presents three questions, to-wit:

1. Was it error for the trial court to admit testimony as to the result of a physical examination of appellant made at the jail while he was under arrest?

2. Was it error to admit in evidence the alleged confession which appellant had signed?

3. Was it error to admit in evidence certain bedclothes and articles of clothing?

The prosecutrix, Pearlena Jackson, a negro girl nine years of age, lived in a two-room house with her mother,

Mary Jackson, and four younger brothers and one younger sister. Her testimony was to the effect that on the night of June 11, 1953, while her mother was not at home and the other children were asleep, appellant, whom she had known as a former neighbor, came to the house, carried her to a bed in the back room, and there raped her. She testified that she was hurt and bleeding; that some time after appellant had left the house her mother returned; that she did not tell her about the matter at that time, because she was afraid; but that later that night she went into the front room, where her mother slept, and told her what had happened.

Mary Jackson, the mother, testified among other things, that about 5:00 or 6:00 o'clock in the afternoon of that day at her home, the children being away, she had had sexual intercourse with appellant, for which he had paid her three dollars; that appellant stayed there with her for about an hour, then went to his house, changed his clothes (from "brown--looking pants, a yellow shirt, and a straw hat", to "dungarees"), and returned about half an hour later; that they then went together to a "piccolo joint", bought and drank some whiskey nearby, and later went to a cafe, where he bought two "chicken suppers". They then returned to her home, where the children had also returned. He gave her one of the chicken suppers and, taking the other with him, left to go to his home, and she saw him no more. About fifteen minutes after his departure, the six children being at home and all awake, she went to a friend's house some three or four doors away, stayed there not over half an hour, and then returned home and went to bed. At that time Pearlena was in the back room where she customarily slept; the mother called to her and she answered, but said nothing about the rape then. Later that night, about 2:00 a. m., Pearlena came into the front room where her mother was sleeping. She was bleeding heavily from the vagina, and stated to her mother that appellant had "messed with her". Mary Jackson then got her sister-in-law, Louise Moseley,

who lived nearby, and together they examined Pearlena and summoned the police and an ambulance.

Patrolman B. E. Fulmer was the first to arrive, followed very shortly by Captain Lackey and Detective Keefe. Fulmer testified that he found the little girl and her mother standing in the hall; that the little girl was nervous, shaking and bleeding, and he made her sit on a couch in the front room; that the sheet on the bed in the back room was bloody and there were clots of blood on the floor near the bed; and that when the little girl got up from the couch to go to the ambulance, there was fresh blood on the couch. Keefe testified that when he arrived "the little girl was in the back room and the ambulance had arrived, and her mother was in the act of putting some panties on the little girl, and I saw blood coming from her vagina and down between her legs". Captain Lackey did not testify.

Dr. L. C. Davis, who examined the prosecutrix at the emergency room of the Columbia Hospital, testified that she was bleeding profusely; and Dr. W. D. Chappelle, who examined her at her home next morning, testified that she was bleeding slightly then, and that the external parts of her vagina were torn.

Appellant, who was employed by a milling company in Columbia, was at work there when he was arrested about 5:30 a. m. on June 12. He was wearing dungarees at the time of the arrest. He denied the charge, and was taken to police headquarters, where he was questioned by Detectives George A. Fulmer and L. D. Paschal. They drove him around to the various places where he said he had been the evening before, including his place of residence, where they obtained a pair of khaki pants, which were later admitted in evidence, and a shirt, which was exhibited and offered in evidence but which does not appear to have been admitted, although the record shows no ruling against its admission. He was then taken back to the police station, where the questioning was resumed by Detectives Fulmer and Paschal and Identification Officer Shealey sometimes together and

sometimes separately. About 11:30 a. m., Shealey obtained from him a confession, which Shealey wrote in long-hand and which was later read to appellant by Detective Fulmer and signed by appellant in the presence of Fulmer and Paschal.

Dr. Chappelle testified that about 10:00 o'clock in the morning of the arrest he examined appellant at the city jail and found a bruise on his penis.

Appellant contends that the physical examination to which he was subjected was compulsory, he being in confinement and in the custody and presence of police officers, and that therefore such examination, and the testimony thereabout, deprived him of the due process of law guaranteed under both the Constitution of the United States and that of this State, and, further, that such examination constituted conduct on the part of the State requiring him to incriminate himself, in violation of his rights under Article I, Section 17 of the Constitution of South Carolina and the Fifth Amendment of the Constitution of the United States. But we have repeatedly held that the protection of these constitutional provisions does not extend to the exclusion of evidence obtained through search of a defendant or examination of his person unaided by his enforced testimony or positive action. *State v. Griffin,* 129 S. C. 200, 124 S. E. 81, 35 A. L. R. 1227; *State v. O'Neal,* 210 S. C. 305, 42 S. E. (2d) 523; *State v. Taylor,* 213 S. C. 330, 49 S. E. (2d) 289; *State v. Myers,* 220 S. C. 309, 67 S. E. (2d) 506, 32 A. L. R. (2d) 430. The facts before us relating to the examination of appellant's person differentiate this case from *Rochin v. People of State of California,* 342 U. S. 165, 72 S. Ct. 205, 96 L. Ed. 183, 25 A. L. R. (2d) 1396. They more nearly accord with those in *Leeper v. State of Texas,* 139 U. S. 462, 11 S. Ct. 577, 35 L. Ed. 225.

The record discloses no error in admitting in evidence the alleged confession of appellant. Before its admission, all of the police officers who had taken part in obtaining it were fully examined and cross-examined

concerning the manner in which it had been obtained, and each testified that it was given freely and voluntarily. It does not appear that appellant was advised beforehand that he need make no statement, or that he was warned that what he might say would or might be used against him; but the absence of such advice or warning does not render a voluntary confession inadmissible. *State v. Miller,* 211 S. C. 306, 45 S. E. (2d) 23. Where the accused has made a confession while in custody, the conduct of the office obtaining it will be rigidly scrutinized in order that the court may determine, before admitting it in evidence, that it was made freely, voluntarily, and uninfluenced by threats or other inducements. The decision whether the proper foundation has been laid for its admission rests in the discretion of the trial judge, whose ruling will not be disturbed unless shown to have been clearly wrong. *State v. Simmons,* 112 S. C. 451, 100 S. E. 149. In the instant case there was no abuse of discretion on the part of the trial judge in admitting the alleged confession upon the showing made by the examination and cross-examination of the officers concerned. Whether or not the confession was made voluntarily or under compulsion then became an issue of fact to be determined by the jury in the light of all the evidence, as the trial judge correctly charged.

There were admitted in evidence, on the part of the State, the following exhibits:

1. The blood-stained sheet;

2. The blood-stained bedspread;

3. Pearlena's panties;

4. Pearlena's dress;

5. The dungarees that appellant was wearing at the time of his arrest;

6. A pair of striped shorts that had been taken from appellant's person after his arrest;

7. A pair of khaki pants, that had been taken from appellant's home.

There was also exhibited before the jury and offered in evidence, as we have before mentioned, a shirt that had been taken from appellant's home.

That Pearlena had bled was a fact that was not in dispute, and that had been testified to by seven witnesses, namely: Pearlena herself, Dr. Chappelle, Dr. Davis, Mary Jackson, Patrolman Fulmer, Louise Moseley, and Detective Keefe. The condition of the bedclothes had been fully testified to by Mary Jackson, Patrolman Fulmer and Detective Keefe. As to the panties and dress, there was no evidence that the child was wearing them at the time of the alleged rape. They were introduced in evidence under the testimony of Mary Jackson, who had been recalled for that purpose alone, and whose testimony thereabout we quote in full:

"Q. Mary, are these * * * what are these things here? A. Her panties.

Q. Those are your little daughter's panties? A. Yes, sir.

Q. That she had on this night we are talking about? A. Yes, sir.

Q. When you saw her? A. Yes, sir.

Q. How about this thing here? A. That's her dress.

Q. That's the dress she had on? A. Yes, sir."

Although Mary Jackson did not so testify, it may be fairly inferred, especially from the testimony of Detective Keefe, that the panties and dress were bloodstained also. Their introduction in evidence, like that of the bedclothes, was wholly unnecessary to establish any material fact, and was calculated to arouse the sympathies and prejudices of the jury. The rule laid down in *State v. Edwards,* 194 S. C. 410, 10 S. E. (2d) 587, and reaffirmed in *State v. Waitus,* 224 S. C. 12, 77 S. E. (2d) 256, with regard to photographs, is no less applicable to exhibits such as those now under consideration. It matters not that the panties and the dress were admitted in evidence without objection on the part of appellant's counsel. The death penalty being here involved, it is our duty to examine the record for any errors affecting the substantial rights of the accused,

even though not objected to at the trial or made a ground of appeal. *State v. Osborne,* 200 S. C. 504, 21 S. E. (2d) 178; *State v. Taylor,* 213 S. C. 330, 49 S. E. (2d) 289; *State v. Waitus,* S. C., 83 S. E. (2d) 629.

The dungarees, shorts and khaki pants in evidence likewise tended to prove no material issue and on another trial should be excluded.

Reversed and remanded for new trial.

STUKES, TAYLOR and OXNER, J.J., and M. M. MANN, A. A. J., concur.