17103

THE STATE, Respondent, v. HAMP JONES, JR., Appellant
(91 S. E. (2d) 1)

*Messrs. Lindsay & Lindsay,* of Bennettsville, *for Appellant,*

*Robert L. Kilgo, Esq., Solicitor,* of Darlington, *for Respondent.*

January 9, 1956.

LEGGE, Justice.

At the June, 1954, term of the Court of General Sessions for Marlboro County, Hamp Jones, Jr., was found guilty of the murder of his mother-in-law, Bertha Moore, and was accordingly sentenced to death. He appeals, charging error on the part of the trial judge:

1. In permitting testimony as to oral statements made by appellant, after his arrest, to the Sheriff of Marlboro County and to the Chief of Police of the City of Bennettsville;

2. In permitting the introduction in evidence of a written confession signed by appellant;

3. In permitting certain exhibits to be introduced in evidence; and

4. In failing to excuse the jury at the conclusion of his charge in order to permit counsel to express objections to the charge or request further instructions as required by the Act of February 20, 1953, XLVIII Stat. at L. 28; 1955 Code Supplement, Section 10-1210.

Bertha Moore, a Negro woman aged forty years, lived not far from appellant and his wife, and kept their small children at her home for them as they were both employed. On Monday, April 12, 1954, about 8:15 a. m., Bertha, mortally wounded, was brought to Marlboro County General Hospital by appellant and one James Dismuth; and she died about ten minutes thereafter. On the top of her skull, to the left of the mid-line, was a triangular depressed fracture, with very severe double laceration, apparently made by a blunt instrument, and being the cause of death. There was a rough, jagged wound above her left temple, and another at the corner of her left eye, apparently also made by a blunt weapon; and there were knife wounds in her left wrist, both breasts, and the lower part of her chest.

Upon being notified of her violent death, Sheriff Weatherly went forthwith to the home of Bertha Moore, a one-story frame building consisting of a kitchen or dining room and two bedrooms. In both bedrooms the bed-covering was blood-stained; in one of them blood-stains, human excrement, and a blood-stained night-dress were on the floor near the bed. Photographs of the exterior of the house and of both bedrooms, as they were found by the sheriff, were introduced in evidence by the State. Following his examination of the premises, Sheriff Weatherly had appellant and James Dismuth arrested and held for questioning.

On April 13, appellant made an oral statement to Sheriff Weatherly, the gist of which was: that about 6:30 in the morning of April 12 he and James Dismuth had gone to Bertha's house to chop some wood for her; that the door was partly open, and when they went into one of the bedrooms they found the bed "messed up" and "quite a bit of blood around"; that in the adjoining bedroom they found Bertha Moore lying on the bed and "quite a bit of blood around there"; that appellant's youngest child, who was in the room, said that a man whom he did not know had been there fighting with Bertha; that appellant sent James Dismuth to get a doctor; and that James Dismuth returned in a little while with Dismuth's brother, in the latter's automobile, and they all took Bertha to the hospital.

The substance of this statement was written out in longhand by the sheriff, but appellant did not sign it, nor does it appear that he was requested to do so. It was not offered in evidence, but the sheriff was allowed, during a recess of the trial, to refresh his memory by reading it. Before being permitted to testify concerning it, he was examined at length by the solicitor, counsel for appellant, and the trial judge, in the absence of the jury; and upon such preliminary examination testified that it had been made by appellant to him in his office freely, voluntarily and without compulsion of any kind. Appellant also, in the absence of the jury, was questioned concerning the same, and stated that the sheriff

had told him that if he didn't tell the truth he would see that he got the electric chair; and also that the sheriff had asked him if he would be willing to take a lie-detector test, to which inquiry he had made no reply. The sheriff denied having mentioned the electric chair in his questioning of appellant.

Even considering appellant's statement as a confession, which it was not, for it contained no admission of guilt, the trial judge properly ruled, following this preliminary examination, that testimony concerning it was admissible, it being for the jury to determine, under proper instructions, whether or not it had been voluntarily made. *State v. Livingston*, 223 S. C. 1, 73 S. E. (2d) 850. And thereupon, the jury having been recalled and the sheriff having testified concerning the circumstances under which the statement had been made, but before testimony as to the substance of the statement was allowed, appellant was permitted to take the stand for the sole purpose of testifying on the issue of whether or not the statement had been freely and voluntarily made. We find no error here.

Between 8:00 and 9:00 o'clock in the evening of April 13, in response to a message from appellant, Sheriff Weatherly went to the jail, where appellant made another statement, following which appellant and the sheriff went to the latter's office, where appellant repeated the statement in the presence of Sheriff Weatherly and Deputy Sheriff Quick. The substance of that statement was that appellant and one Bossy Brisbane had gone to Bertha Moore's house on the night of Sunday, April 11; that they had broken in through the back door; and that appellant had held Bertha while Brisbane had struck her. Before testimony as to this oral confession was permitted, both the sheriff and appellant were examined in the absence of the jury as to whether it had been voluntarily made. The sheriff testified that it was so made. Appellant testified that he had sent for the sheriff because a colored boy, a prisoner at the jail, with whom he had been talking, had told him that he should tell the sheriff the truth about

the matter; and he further testified that, although he was still afraid about what the sheriff had previously said to him concerning the electric chair, no mention of the electric chair was made on this occasion, and no force of any kind was exercised upon him. Following this preliminary examination, the trial judge, as he had done with regard to appellant's first oral statement, permitted testimony concerning this one.

On April 13 or 14, appellant also made an oral statement to Mr. Floyd Davis, Chief of Police of the city of Bennettsville, who was assisting the sheriff in his investigation, and who testified preliminarily that the statement was made in his office after he had interrogated appellant for some thirty minutes, and without threat or promise of any kind. Appellant testified that Mr. Davis had told him that he might as well tell the truth, that the sheriff would make it good for him or could make it hard for him, and that Mr. Davis would look out for him. Mr. Davis denied having made such a statement, and on the contrary testified that when appellant decided to confess appellant told him that he would have to help him, to which he had replied that he was in no position to help. The substance of appellant's statement, as testified to by Chief Davis, was as follows: that some time after midnight of April 11 he went into Bertha Moore's house and struck her with a metal fire poker; that he then went outside and waited a while, and, hearing her go into the other room, he went back into the house and hit her again; that he then left, but came back about daylight and stabbed her; and that he just didn't know why he had done it.

On Wednesday, April 14, Deputy Sheriff A. J. Quick, in company with Rural Policeman W. S. Allen, took appellant to the scene of the crime and there, at appellant's direction, found under the barn a butcher knife, a crowbar and a fire poker, which appellant stated he had put there. There was hair on the poker. They then returned to the sheriff's office, where appellant made a confession that was thereupon written out by Mr. Quick in longhand and signed by appellant and witnessed by the two officers. Next day he signed a typed

verbatim transcript of it, and was given a typewritten copy, for which he signed a receipt. Before this confession was admitted in evidence, Deputy Sheriff Quick was examined, in the absence of the jury, and testified that it had been given freely and voluntarily and without coercion of any kind. Appellant was also examined in the absence of the jury, and testified that he had confessed because Mr. Quick had told him to remember what the sheriff had said about the electric chair. He said that he had not been given a chance to read the statement before signing it. He admitted receipt of the copy of it, which at the time of the trial was still in his possession. The substance of this confession was as follows:

On Monday morning, April 12, before daylight, appellant went to Bertha Moore's house and he and she talked about his wife. He grabbed a fire poker and hit her, started to leave, and then hit her again.—"pretty hard that time". Later that morning he and his brother James Edward and James Dismuth went to her house in a truck belonging to appellant's employer. Bertha was up, and "mentioned it again", so he hit her again, and then stabbed her twice with a kitchen knife, after which they left with the truck, which appellant took to his employer. Then, after having stopped for about ten minutes at the home of appellant's mother, he and Dismuth went back to Bertha's house. She was sitting up in bed, and appellant's little boy was standing on the floor, with an orange in his hand. Appellant, having sent Dismuth to tell appellant's brother to get a doctor, got a crowbar from behind the door, and hit Bertha with it. Then he took the knife and the poker and the crowbar and threw them under the barn, went back into the house, and was dressing the children when Dismuth returned with appellant's brother and the latter's wife; and they took Bertha to the hospital.

Where evidence is conflicting on the issue of whether or not a confession was voluntary, it is the duty of the trial judge to submit that issue to the jury. *State v. Scott,* 209 S. C. 61, 38 S. E. (2d) 902; *State v Livingston,* 223 S. C. 1, 73 S. E. (2d) 850; *State v. Sanders,* 227 S. C.

287, 87 S. E. (2d) 826; *State v. Cahssteen,* S. C., 88 S. E. (2d) 880; *State v. Boone,* S. C., 90 S. E. (2d) 640, Westbrook's Advance Opinions Week Ending Dec. 17, 1955. In the case at bar the written confession and testimony as to the three prior oral statements of the appellant were properly admitted in evidence following the preliminary examination concerning the question of whether they had been voluntarily made. And the trial judge properly instructed the jury that it was their province alone to determine whether a confession had been made and, if so, whether freely and voluntarily or under duress or in fear or because of promise of reward, and that it was their duty to disregard it unless they found that it had been made freely and voluntarily.

Appellant contends, however, that the written confession was inadmissible because he had not been given a copy of it until the day after he had made it. Section 2 of the Act of the General Assembly approved March 1, 1952, Code Supplement 1955, Section 26-7.1, provides that "no witness in any preliminary hearing or in any criminal judicial proceeding of any kind or nature shall be examined or cross-examined by any examiner, solicitor, lawyer or prosecuting officer concerning a written statement formerly made or given to any person employed by the State or any county, city or municipality thereof, or any part of any such governing body, unless it first be shown that at the time of the making of the statement the witness was given an exact copy of the statement and that before his examination or cross-examination the witness was given a copy of the statement and allowed a reasonable time in which to read it."

Section 1 of the Act above referred to, which appears in the 1955 Code Supplement as Section 1-64, provides that "whenever any person employed by the State or any county, city or municipality thereof, or any part of any such governing body, shall take a written statement in any investigation of any kind or nature from any person, the person receiving or taking the written statement shall give to the person making the statement a copy thereof and shall obtain from the

person making the statement a signed receipt for the copy so delivered."

We note, in passing, that the word "witness" as used in Section 2 of the Act obviously refers to the person who made the "written statement", and not to any other witness who may be examined concerning the same.

Reasonably construed, the provision in Section 2 of the Act that the witness be given a copy of the written statement "at the time of the making of the statement" does not mean that such copy must be given *eo instante*. The requirement of the statute is satisfied if a copy of the statement be given within a reasonable time after its making, considering the surrounding circumstances, and at all events far enough in advance of the hearing or proceeding to permit the witness to read it before being examined or cross-examined concerning it.

In the case at bar, as we have before mentioned, appellant's statement was taken down in longhand on April 14, 1954, and thereupon signed by him; and on the next day it was transcribed *verbatim* in typewriting, and thereupon appellant signed the original typewritten transcript and was given a typewritten copy, for which he receipted. Both the statement written in longhand and the typewritten transcript were introduced in evidence; it is not disputed that the language of both was identical; and appellant, in his testimony preliminary to their introduction, admitted his signature to both and his receipt, on April 15, of the typewritten copy, which was still in his possession. Whether under other circumstances the statutory requirement would be fulfilled by giving to a witness a copy of his statement on the day following that on which he made it is a matter with which we are not here concerned; it is clear that under the facts just recited the admission of the typed statement was in literal compliance with the statute, and the admission of the longhand statement was not prejudicial error.

The photograph of one of the bedrooms as it was found by the sheriff showed large stains on the bedspread and the floor, which he testified were blood and human excrement, and also, on the floor, a stained garment, identified by the witness as a bloody nightdress. Appellant urges that the admission of this photograph in evidence was unnecessary because it was undisputed that the alleged attack had taken place in the bedroom and that the deceased had bled profusely, that it was without probative value, and that its only purpose was to inflame the jury to his prejudice. The determination of its relevancy and materiality was a matter for the sound discretion of the trial judge. *State v. Edwards*, 194 S. C. 410, 10 S. E. (2d) 587. This photograph, as well as that of the other bedroom and those of the exterior of the deceased's house, served to clarify the testimony concerning the locus, and we find no abuse of discretion in their admission. Nor, in the light of appellant's confessions and of his testimony, to which we shall later refer, does the photograph first mentioned appear so inflammatory as to warrant reversal.

Deputy Sheriff A. J. Quick testified that when he found the poker under the barn, as before mentioned, there appeared to be some black hair on it; that the poker, as well as the crowbar and the kitchen knife, were mailed by him to the Federal Bureau of Investigation, Washington, D. C., and later returned, together with a slide containing the hair that had been removed from the poker. This slide was admitted in evidence under Mr. Quick's testimony although he stated that he could not say whether or not the hair under the slide was the same as that which had been taken from the poker. The slide was admitted in evidence without objection, and appellant's counsel in this appeal, who did not participate in the trial, now contend that its admission was improper, and that it, like the photograph above referred to, was calculated to inflame the jury. This being a capital case, it makes no difference that objection to the admission of this exhibit was not made at the trial. *State*

*v. Green,* 227 S. C. 1, 86 S. E. (2d) 598. Had timely objection been made this exhibit should have been excluded, for the obvious reason that the witness Quick was not competent to, and did not attempt to, identify the hair on the slide as that which had been on the poker. But in our view the error in its admission does not, in view of appellant's testimony, warrant reversal.

At the conclusion of his charge to the jury, the trial judge, following the requirement of the Act of February 20, 1953, XLVIII Stat. at L. 28, 1955 Code Supplement, § 10-1210, excused the jury and thereupon asked counsel if they had any objections to the charge as given, or if any further instruction to the jury was desired. Counsel for the defendant then called the trial judge's attention to the fact that he had not charged the law applicable to confessions; and thereupon the trial judge recalled the jury and fully and properly charged them in that regard. No exception has been taken or could properly be taken, to such additional charge; but appellant's present counsel now contend that after having given such additional instructions the trial judge should have again excused the jury for the purpose of giving counsel the opportunity to express objections to his charge concerning confessions, or to request the charge of additional propositions made necessary by the charge, and that in failing to do so he violated the statute before mentioned.

The statute provides that "after the court has delivered to the jury a charge on the law in the case the court shall temporarily excuse the jury from the presence of counsel and litigants in order to give counsel and litigants an opportunity to express objections to the charge or request the charge of additional propositions made necessary by the charge, out of the presence of the jury". Its purpose is to afford to counsel and litigants the opportunity, at the conclusion of the charge, to discuss it freely with the trial judge, to indicate wherein he may have erred in his instructions, and to request such further instructions as

might be necessary. *Munn v. Asseff,* 226 S. C. 54, 83 S. E. (2d) 642. Neither expressly nor by necessary implication does it require more than one opportunity for such discussion, and in our view it is sufficiently complied with where such opportunity has been afforded at the conclusion of the main charge. In the present case, moreover, there is no suggestion that the additional charge was erroneous or inadequate.

As is our duty where the death penalty is involved, we have carefully searched the record here for possible error not covered by the exceptions, and we find none. The defendant took the stand, and his own testimony, which in the main corroborated his confessions, amply warranted the verdict. Following is the substance of his testimony:

On Sunday evening, April 11, 1954, about 8:30 o'clock, appellant and Alexander Brown and Bossie Brisbane stopped at Bertha Moore's house to deliver a jug of kerosene that she had asked appellant to get for her. Appellant delivered the jug to her at the door, and as he was leaving she told him that she wanted to see him "on some particular business" and that he could come in at any time later that evening.

Shortly after midnight that night appellant, who had gone to bed at his brother's house, decided that he would walk through the fields to Bertha Moore's house to see what she wanted. At his knock she let him in, and proceeded to upbraid him for running around with other women while his wife was away working. She declared that she would write to his wife concerning his conduct, that she was not going to take care of his children, and that he had better attend to them himself. Appellant, who had by then gotten "kind of warm", replied that he would take the children to his mother's house. As he was about to get the baby from the bed, Bertha picked up the fire poker and struck at him; he caught it by the end; she snatched it out of his hand; and he ran for the back door, with Bertha in pursuit. Before

he could open the door, she struck at him again, and he took the poker from her, carried her into the bedroom, pushed her onto the bed, and struck her down with the poker. He then went out through the front door, came back in and latched it, went out through the back door, and waited outside of the house, where, after a while, he heard her go into the other room. Then he went back to his brother's house. Early next morning he and his brother and James Dismuth drove the truck of appellant's employer to Bertha's house to leave with her a pillowcase full of soiled clothes. Appellant walked around to the back door, but, being unable to make himself go in, he told the others that Bertha and the children had not yet gotten up; and they then departed. Appellant's brother was dropped at the place where he worked, and appellant and Dismuth, having taken the truck to its owner, went first to the house of appellant's mother and then to his own, where they discussed going back to Bertha Moore's house. They both entered through the back door and walked through one bedroom and into the other, where they found Bertha sitting up on the bed. Appellant told Dismuth to get appellant's brother "to come over here to take her to the doctor", and Dismuth then ran out of the house through the back door. Bertha had a kitchen knife in the bed, and appellant took it from her and stabbed her twice with it. Then he went into the kitchen, got a pan of water and a towel and returned to the bedroom. When he set the pan of water on the bed Bertha snatched a small crowbar from under the cover, and appellant took it from her and struck her with it twice. He then took the poker and the knife and the crowbar, one by one, and threw them under the barn.

In view of this testimony the trial judge gave appellant the benefit of a full and clear charge on the law of self-defense; but the jury was fully justified in rejecting that plea, for it will be noted that even according to appellant's testimony, he was never struck by any of the three weapons, but on the contrary took them away from Bertha one by one,

and struck her with them in turn when she was unarmed and defenseless.

Appellant's counsel in this appeal did not take part in the trial, but undertook to handle the appeal without compensation after counsel who had represented appellant at the trial discontinued his practice in Marlboro County. In closing this opinion we desire publicly to commend appellant's counsel for their able and vigorous presentation of the appeal.

The judgment of the lower court is affirmed.

STUKES, TAYLOR and OXNER, JJ., concur.

J. WOODROW LEWIS, Acting Associate Justice, disqualified.