211 So.2d 917

**John Henry COLEMAN and Otis Stephens**

v.

**STATE.**

**6 Div. 316.**

Court of Appeals of Alabama.

April 23, 1968.

Rehearing Denied May 21, 1968.

Hogan, Wilder, Tarter & Wininger, Birmingham, for appellants.

MacDonald Gallion, Atty. Gen., and Robt. F. Miller, Asst. Atty. Gen., for the State.

JOHNSON, Judge.

Appellants were indicted by the Grand Jury of Jefferson County, Alabama, for the offense of assault with intent to murder. After pleading not guilty, appellants were tried jointly by a jury, found guilty as charged, and sentenced to a term of twenty years in the State penitentiary. Following denials of their motions for a new trial, this appeal is taken.

Casey Frank Reynolds testified for the State that at about 11:30 P.M. on July 24, 1966, he and his wife were travelling south on the Green Springs Highway when he had a flat tire and pulled off onto the shoulder of the road at the top of the hill to repair it. Reynolds testified that as he was changing the tire, he noticed three people on the median of the highway running toward him; that previous to this time he had observed a car parked on the opposite side of the road headed North; that as the three people ran toward him he was shot once; that the men ran up to within three or four feet of him; and that one of the men who he identified as appellant Coleman, put his hand on his (the witness's) wife's shoulder. Reynolds stated that after a few seconds he observed lights from an approaching vehicle and that appellants turned as if to leave; that appellant Stephens turned and "pointed his arm" at the witness and fired a shot; after which all three ran back across the road to the car which was parked there; and that they left the scene in the car. Reynolds stated on cross-examination that he later was called and asked to come to the city jail where he identified appellants as the men who assaulted him.

Robert Steele testified that he, the two appellants, and one John Hodge, were together on the night of July 24, 1966; that they had been to the Sandy Ridge Club in Oxmoor; and that as the four of them were returning from the club appellant Stephens said, "We could catch a man walking the street and rob them," and that he (Steele) "told him I didn't think we had to do it."

Steele further stated that "about middleways up the hill" on the Green Springs Highway, he began having car trouble and that he pulled the car onto the shoulder of the road where he got out, lifted the hood, and tried to get the motor running again; that while he was under the hood he heard some shots behind him; that he came from under the hood and shouted, "I'm fixing to go;" that he saw the other three men, including the appellants, on the other side of the street; and that there was a car parked on the other side. He further stated that he saw a white man and lady; that he saw appellant Stephens make "one shot after the man;" that the three men ran back to the car and got in; and that he (the witness) drove away from the scene.

Detective Hart testified for the defense that he was present at a line-up on October 1, 1966, at which time Casey Reynolds identified appellants; that there were six men in the line-up; and that all six men were required to say the words, "Let's take her in the woods", or something to that effect. Hart further testified that prior to the men saying these words, Reynolds had identified both appellants as his assailants.

Appellant Otis Stephens, testifying in his own behalf, said that he, John Hodge and Robert Steele were all together on the night of July 24, 1966; that Steele had been "drinking or taking pills;" and that as Steele was driving the car on the Green Springs Highway at about the top of the hill he ran onto the shoulder and that Hodge had to slam on the brakes to keep the car from going down the shoulder. He then testified that Steele, upon seeing a car parked on the other side of the road, said he was going to rob them. Appellant Stephens then testified in part as follows:

"A. * * * I told him I wasn't going to have nothing to do with it, and me and him got to scuffling.

"Q. You and who?

"A. Me and Robert Steele, and John Hodge broke it up, and he pulled a pistol out and went over there.

"Q. Who did?

"A. Robert Steele.

"Q. Who went with him?

"A. John Hodge.

"Q. All right.

"A. And during the while they were over there, I was thinking about leaving, waiting on them.

"Q. Were you going down the hill, or up the hill?

"A. Down the hill.

"Q. All right.

"A. Towards town, and I got about two or three feet from the front end of the car and I heard a shot, and then I stopped and went over there, and about the time I got over there John Hodge was getting out of the car.

"Q. Getting out of what car?

"A. The woman's and the man's car.

"Q. All right.

"A. With a bag, and Robert Steele was standing over the man, with a pistol, and then he broke and run, and I met them in the center of the street, and I turned around and came back. Robert Steele shot again and then he jumped in the car, and drove it down the highway."

Stephens further stated that appellant Coleman was not with him on the night in question.

Appellant contends that the preliminary hearing of an accused in the State of Alabama is a stage of the criminal proceedings within the assistance of counsel guarantee of the Sixth Amendment.

In their respective briefs' appellants' counsel state in part as follows:

"It is the firm opinion and position of the Appellant's counsel that at any time after the investigative process has become accusatory and focalized upon the defendant that the defendant has without a doubt, guaranteed by the Constitution of the United States of America, the right to have counsel, either retained or appointed, present with him to protect those rights. * * * In fact, with effective cross-examination by competent counsel, the accused may very well be exonerated and thereby not even bound over to the Grand Jury. On the contrary, lack of effective cross-examination might well settle the accused's fate and reduce the trial itself to a mere formality."

The Supreme Court of the United States in Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923, held that a transcript of a witness's testimony given at the preliminary hearing was inadmissible at the trial of the petitioner where the testimony "had not been taken at a time and under circumstances affording petitioner through counsel an adequate opportunity to cross-examine." The Court further stated in part:

"Under this Court's prior decisions, the Sixth Amendment's guarantee of con-

frontation and cross-examination was unquestionably denied petitioner in this case."

The Supreme Court declined to rule on the question as to whether or not the preliminary hearing was a critical stage of the proceedings requiring appointment of counsel. The court said in part:

"In this Court we do not find it necessary to decide one aspect of the question petitioner raises, that is, whether failure to appoint counsel to represent him at the preliminary hearing unconstitutionally denied him the assistance of counsel within the meaning of Gideon v. Wainwright, supra [372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799]. In making that argument petitioner relies mainly on White v. State of Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193, in which this Court reversed a conviction based in part upon evidence that the defendant had pleaded guilty to the crime at a preliminary hearing where he was without counsel. Since the preliminary hearing there, as in Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114, was one in which pleas to the charge could be made, we held in White as in Hamilton that a preliminary proceeding of that nature was so critical a stage in the prosecution that a defendant at that point was entitled to counsel. But the State informs us that at a Texas preliminary hearing, such as is involved here, pleas of guilty or not guilty are not accepted and that the judge decides only whether the accused should be bound over to the grand jury and if so whether he should be admitted to bail. Because of these significant differences in the procedures of the respective States, we cannot say that the White case is necessarily controlling as to the right to counsel. Whether there might be other circumstances making this Texas preliminary hearing so critical to the defendant as to call for appointment of counsel at .that stage we need not decide on this record, and that question we reserve."

We are of the opinion that the differences in the procedures of the respective States as stated in the *Pointer* opinion, supra, are also present in the case at bar.

■ The purpose of preliminary hearing in Alabama is to determine whether an offense has been committed and if so whether there is probable cause for charging the defendant therewith. If there is probable cause to believe that the defendant is guilty thereof, then it is also the duty of the magistrate to fix bail if it is a bailable offense. Code of Alabama, 1940, Tit. 15, Secs. 139–140.

■ Thus, the subject matter of the preliminary hearing is temporary restraint of the accused person's liberty. Its purpose is not to convict; that is the trial court's function. Nor is it to procure evidence for conviction; that is the prosecution's duty. Wood v. United States, 75 U.S.App.D.C. 274, 128 F.2d 265, 141 A.L.R. 1318.

In extending the Sixth Amendment right to counsel guarantee to arraignment proceedings, the Supreme Court of the United States in Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114, said in part, "What happens there may affect the whole trial. Available defenses may be irretrievably lost, if not then and there asserted." See also White v. State of Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193.

■ At the preliminary hearing, however, the accused is not required to advance any defenses, and failure to do so does not preclude him from availing himself of every defense he may have upon the trial of the case. Also Pointer v. State of Texas, supra, bars the admission of testimony given at a pre-trial proceeding where the accused did not have the benefit of cross-examination by and through counsel. Thus, nothing occurring at the preliminary hearing in absence of counsel can substantially prejudice the rights of the accused on trial.

■ We are not persuaded, therefore, that there are circumstances making the preliminary hearing so critical as to call for appointment of counsel.

Appellants also contend that their identification by Reynolds at the pre-trial line-up was so unnecessarily suggestive as to violate due process of law, and that it was thereby reversible error for the trial court to admit the in-court identification of the accused.

Appellants concede that the right to counsel at a pre-trial line-up is not applicable in this case. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199. However, appellants argue that the record reveals the injured party, Casey Frank Reynolds, was totally unable to identify his assailants prior to the line-up. Appellants base their contention on the fact that Reynolds testified that he told police officers that he did not think he would be able to identify his assailants.

■ The fact that an injured party tells law enforcement officials that he does not think he could identify his assailants should not preclude his making a subsequent identification, nor should such fact affect its admissibility into evidence.

■ Testimony from the record reveals that the line-up was not "so unnecessarily suggestive and conducive to irreparable mistake in identification that appellants were denied due process of law."

Reynolds testified in part as follows:

"Q. Have you been over to a line-up to observe these two defendants on any other dates, or any occasion, than the one time?

"A. No, sir.
"Q. Have you ever been inside any line-up room in any city jail at any time before that?

"A. No, sir.

"Q. That is the only time?

"A. Yes, sir.

"Q. Now, have you seen either Otis Stephens, or John Henry Coleman, handcuffed any time prior to then?

"A. No, sir.

"Q. Have you seen them behind any bars?

"A. No, sir.

"Q. Have you seen them in the hall of the City Jail, or anywhere else in custody?

"A. No, sir.

"Q. Had any detective said anything to you about either of these two defendants, that is, John Henry Coleman and Otis Stephens, about their identification, or suggest who they might be, before you went into the line-up room or any time?

"A. No, sir."

The preceding testimony indicates no improper suggestion by law enforcement officers in the witness's identification of appellants.

■ Testimony was also received to the effect that while the line-up was being conducted, appellants were required to say the words, "Get in the woods," or words to that effect. The Fifth Amendment privilege against self-incrimination "protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature * * *" Schmerber v. State of California, 384 U.S. 757, 761, 86 S.Ct. 1826, 16 L.Ed.2d 908.

In Wade v. United States, 358 F.2d 557 (5 Cir. 1966), the United States Court of Appeals stated in part as follows:

" * * * [E]ach of the persons in the lineup was required to repeat words something like, 'Put the money in the bag' in order that the witnesses could hear similar words to compare with their recollection of the sound of the voice of

the person who gave them such instructions at the time of the robbery."

On certiorari to the S.Ct. of the U. S., United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, the Supreme Court stated in part as follows:

" * * * [C]ompelling Wade to speak within hearing distance of the witnesses, even to utter words purportedly uttered by the robber, was not, compulsion to utter statements of a 'testimonial' nature; he was required to use his voice as an identifying physical characteristic, not to speak his guilt. * * * We recognized that 'both federal and state courts have usually held that * * * [the privilege] offers no protection against compulsion to submit to fingerprinting, photography, or measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture.' Id., at 764, 86 S.Ct. at 1832. None of these activities becomes testimonial within the scope of the privilege because required of the accused in a pretrial lineup."

Compelling appellants to say the words spoken at the time of the assault in question for the purpose of identification was not compulsion to utter statements of a testimonial nature; they were required to use their voices as identifying physical characteristics, not to speak their guilt.

■ We are of the opinion that the lineup was properly conducted and that the appellants were not required to do or say anything that would incriminate them as a violation of their Fifth Amendment rights.

■ We conclude, therefore, that there was sufficient evidence bearing on the identity of the assailants from which the jury might find that appellants were the assaulting parties. Gray v. State, 38 Ala.App. 508, 88 So.2d 798.

Having made a diligent search of the record and finding no error therein, we are of the opinion that the judgment in this cause is due to be and the same is hereby

Affirmed.

CATES, Judge (concurring specially).

After Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, this affirmance cannot apply as a precedent for trials after June 12, 1967. See Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199. Hence, I think this case falls under Code 1940, T. 13, § 66, so as to do away with the need for an opinion to explain the decision.

If there is any arguable point here, it would require the Supreme Court of Alabama to overrule Aaron v. State, 271 Ala. 70, 122 So.2d 360. Therein Lawson, J., wrote in part:

"The writer and Justices STAKELY and COLEMAN are of the opinion that the testimony as to the identity of the defendant based on the enforced repetition by the defendant of words alleged to have been used at the scene of the crime was inadmissible and highly prejudicial. They entertain the view that such evidence violated the right guaranteed to the defendant by § 6 of the Constitution of this state not to be 'compelled to give evidence against himself,' for the conclusion of the prosecutrix of defendant's identity was based almost exclusively on this enforced conduct of the defendant. Beachem v. State, 144 Tex.Cr.R. 272, 162 S.W.2d 706; State v. Taylor, 213 S.C. 330, 49 S.E.2d 289, 16 A.L.R.2d 1317. The Texas constitutional provision against self-incrimination is identical with that of this state. See 27 North Carolina Law Review 262; 24 Indiana Law Journal 587; 1 Vanderbilt Law Review 250.

"The defendant was not merely required to speak; he was compelled to repeat certain specific words or phrases which the prosecutrix had told the officials her assailant used during the course of the

attack. The South Carolina and Texas cases specifically condemn this practice. * * * "

However, in view of the emphasis exhibited by Merrill, J., in Seals v. State, 271 Ala. 142, 122 So.2d 513, I see no adoption of the South Carolina rule. Even though the use of the same words [1] may be highly suggestible, Alabama seems uncommitted as to labeling the device as self-incriminatory.

Thus in *Aaron,* supra, we find at page 84 of 271 Ala., at page 372 of 122 So.2d:

"However, LIVINGSTON, C. J., and SIMPSON, GOODWYN and MERRILL, JJ., are clear to the conclusion that the record in this case, when construed in the light most favorable to the defendant, does not show that he was 'compelled' to give evidence against himself. Consequently, they do not express any view concerning the right of the State to compel a prisoner to repeat in the presence of the prosecutrix certain specific words or phrases which the prosecutrix contends were uttered by her assailant."

Correctly, all the members of our Supreme Court kept the primary emphasis on compulsion vel non. The words which are used in a line up are prejudicial only if the jury infers that the defendant is confessing.

In this connection, the contrast of voice identification with the reliability and objectivity of dactylography is denigrated by an excerpt from Weintraub, Privilege against Self-Incrimination, 10 Vand.L.Rev. 485, at 505:

"Only compelled conduct which places reliance on the veracity of the accused and which may aid in convicting him of a crime for which he can be punished should be within the scope of the privilege. It would seem that a compelled voice test does meet this requirement. As is the case in the execution of handwriting exemplars, a direction to an accused to speak for identification purposes implies a command that he speak in his normal voice. When the accused speaks, he is making the statement, 'This is my voice.' Since, in practice, voice identifications are usually made by inexpert laymen, the suspect who disguises his voice has an even greater chance of defeating identification than the suspect who attempts to disguise his handwriting."

Aaron was retried and came up again under the Automatic Appeal Act. Aaron v. State, 273 Ala. 337, 139 So.2d 309. More detail as to the voice identification was adduced.

However, several reasons are listed to support the conclusion that Aaron was not compelled to testify against himself. One reason was that the victim identified Aaron before the deputy ("no threat, *coercion,* hope or promise of reward" being made to Aaron) asked Aaron to repeat the rapist's words, "turn me loose."

Thus the question appears still unresolved in Alabama.

In this case I fail to find in the appellant's brief any statement of testimony that at the line up at which Reynolds made the identification the police threatened or coerced any of the men into speaking. But see United States v. Wade, 388 U.S. 218, at 231, fn. 11, 87 S.Ct. 1926, as a claim of prejudicial suggestiveness in Aaron v. State, 273 Ala. 337, 139 So.2d 309, supra.

United States v. Wade, supra, came from a divided court. A portion from Part I of the opinion of Brennan, J., was quoted herein by my Brother Johnson. The vote on Part I was 5–4.

---

1. In Orr v. State, 225 Ala. 642, 144 So. 867, the words Orr used in jail are not set out in the opinion nor was compulsion shown. State v. Freeman, 195 Kan. 561, 408 P.2d 612.

In Biggers v. State, Tenn., 411 S.W.2d 696, we find:

"In the instant case defendant was told what words to say and in repeating them he did not give any factual information tending to connect him with the crime; nor could any reliance be placed on these words which would indicate defendant was conscious of, or had knowledge of, any facts of the crime. The only thing he gave was the sound of his voice to be used, along with other things, solely for the purpose of identification. Under these circumstances we do not think defendant's constitutional right against self-incrimination was violated. * * *"

Thus I believe that a properly drawn instruction for the trial court to give the jury could direct the jury that the words employed are not confessory.

In this area of essentially police administration, safeguards against suggestibility are usually employed. I would adopt as the most comprehensive vademecum the following quotation (omitting citations and footnotes) from Traynor, C. J., in People v. Ellis, 65 Cal.2d 529, 55 Cal.Rptr. 385, 421 P.2d 393:

"Defendant was arrested on September 9, 1964, and taken to the San Mateo Police Department, where the victim identified him in a lineup as her assailant. The victim also indicated that she could identify her assailant's voice. She was placed in a room next to the interrogation room, and defendant was asked to repeat phrases recited by the police. Defendant refused to cooperate and remained silent.

"Police officers testified that they advised defendant of his right to counsel and of his right to remain silent and testified to his responses to their questions. They also testified that he refused to participate in the voice identification test. Defendant contends that introduction of the evidence of his refusal to participate in a voice identification test and the prosecutor's comments thereon violated his constitutional privilege against self-incrimination.

"The privilege against self-incrimination applies to evidence of 'communications or testimony' of the accused, but not to 'real or physical' evidence derived from him. * * * The results of voice identification tests fall within the category of real or physical evidence. * * * In such a test, the speaker is asked, not to communicate ideas or knowledge of facts, but to engage in the physiological processes necessary to produce a series of articulated sounds, the verbal meanings of which are unimportant. The sounds alone are elicited for identification purposes through characteristics such as pitch, tone, intonation, accent, and word stress. The speech patterns of individuals are distinctive physical characteristics that serve to identify them just as do other physical characteristics such as color of eyes, hair, and skin, physical build and fingerprints.

"Voice identification testimony is the product of an observable physical characteristic made by an independent witness. It is the very type of objective factual evidence, independent of information communicated by the accused, that the privilege encourages police to seek. Moreover, independent identification testimony, unlike testimonial evidence derived from the accused, raises no question of reliance on the veracity of the accused. Any attempt by a suspect to disguise his voice is apt to be detected readily by those persons present who can compare the sample with his normal voice. Futhermore, there is no risk that one could be coerced into falsely accusing himself. It is difficult to imagine how a suspect could be induced to impersonate an unknown voice to incriminate himself.

"It has been urged that the privilege reflects an ultimate sense of fairness that prohibits the state from demanding assistance of any kind from an individual in penal proceedings taken against him. The privilege includes no such prohibition.

438 .

Criminal proceedings are replete with instances where at least passive cooperation of an accused may be constitutionally required.

"A suspect asked to speak for voice identification is not subjected to the same psychological pressures are reduced to the by a demand for testimony. It is no more unfair to ask a suspect to speak for voice identification than to ask him to appear in a lineup for visual identification. The psychological pressures are reduced to the same degree, through a limitation of alternatives. Deceit is improbable; the simple choice for a guilty person is between conduct likely to expose incriminating evidence and inferences as to guilt likely to flow from a successful refusal to participate.

"A related view of the individual interest protected by the privilege focuses on the right of privacy. * * * The Fifth Amendment right of privacy protects at least uncommunicated thoughts and has been extended to preclude compelled production of private papers and documents. * * * A voice test, however, contemplates no such intrusion into privacy; no disclosure of thought or privately held information is requested. One's voice is hardly of a private nature. It is constantly exposed to public observation and is merely another identifying physical characteristic.

"It thus appears that an extension of the privilege to voice identification would serve none of the purposes of the privilege. It would only exclude evidence of considerable importance when visual identification is doubtful or impossible. The masked robber, the telephone extortionist, and the attacker in the night may all seek refuge behind an extension of the privilege that would do little to further the welfare of accused persons in general. Denial of access to a pertinent identifying trait can only weaken a system dedicated to the ascertainment of truth.

"We do not leave the individual unprotected. The need for protection is greater in confession cases where the risk of police overzealousness is comparatively great because self-incriminating statements are the most persuasive evidence of guilt. Testimony by a witness resulting from a purported identification is less conclusive and there is therefore less incentive for police to use unwarranted pressure in obtaining the evidence. Nevertheless, it bears emphasis that, as in the case of all police procedures for the securing of nonprivileged evidence, fundamental principles of fairness and due process are always applicable to prevent abuse. * * *

"Even though evidence obtained from a voice identification is not within the privilege against self-incrimination, the question remains whether evidence and comment on a refusal to take such a test is admissible. It is clear that 'it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation.' * * * This doctrine is a logical extension * * * of the rule of Griffin v. State of California (1965) 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, * * * prohibiting comment on the failure of an accused to testify at trial. Comment on refusal to testify was held to be 'a penalty imposed by courts for exercising a constitutional privilege. It cuts down on the privilege by making its assertion costly.' * * * Such a rule is not applicable when, as in this case, the defendant has no constitutional right to refuse to speak solely for purposes of voice identification.

"Nor was defendant's refusal to 'display his voice' itself a testimonial communication. It was circumstantial evidence of consciousness of guilt, and like similar evidence, such as escape from custody (People v. Otis (1959) 174 Cal.App.2d 119, 344 P.2d 342), false alibi (People v. Allison (1966) 245 A.C.A. 590, 245 Cal.App.2d 568, 54 Cal. Rptr. 148), flight (People v. Hoyt (1942) 20 Cal.2d 306, 125 P.2d 29), suppression of evidence (People v. Burton (1961) 55 Cal. 2d 328, 11 Cal.Rptr. 65, 359 P.2d 433), and

failure to respond to accusatory statements when not in police custody \* \* \* its admission does not violate the privilege. Moreover, as in the foregoing examples, the evidence did not result from a situation contrived to produce conduct indicative of guilt. Unlike the superstitious tests described by Wigmore [3d. Ed. § 275] and their modern successor, the lie detector, that have as their sole purpose the establishment of an environment in which the accused's consciousness of guilt can be detected, the purpose of asking defendant to speak was to obtain probative physical evidence and the conduct was merely incident to that effort. A guilty party may prefer not to find himself in a situation where consciousness of guilt may be inferred from his conduct, but it can scarcely be contended that the police, who seek evidence from the test itself, will tend to coerce parties into refusing to take tests in order to produce this evidence.

"Although conduct indicating consciousness of guilt is often described as an 'admission by conduct,' such nomenclature should not obscure the fact that guilty conduct is not a testimonial statement of guilt. It is therefore not protected by the Fifth Amendment. By acting like a guilty person, a man does not testify to his guilt but merely exposes himself to the drawing of inferences from circumstantial evidence of his state of mind.

"We are aware that the United States Supreme Court in Schmarber v. State of California (1966) 384 U.S. 757, 765, fn. 9, 86 S.Ct. 1826, 16 L.Ed.2d 908, has cautioned that in some cases the administration of tests might result in 'testimonial products' proscribed by the privilege. We do not believe, however, that the inferences flowing from guilty conduct are such testimonial products. Rather, the court's concern seemed directed to insuring full protection of the testimonial privilege from even unintended coercive pressures. In the case of a blood test for example, the court considered the possibility that fear induced by the prospect of having the test administered might itself provide a coercive device to elicit incriminating statements. Such a compelled testimonial product would of course be inadmissible.

"Evidence of the refusal is not only probative; its admission operates to induce suspects to cooperate with law enforcement officials. Only the overriding interest in protecting the privilege against compulsory self-incrimination, itself the result of a delicate balance, prohibits evidence or comment in the refusal to testify cases. But the privilege itself is not at issue here. Without exception, none of the reasons that support the privilege lends support to a rule that would exclude probative evidence obtained from an accused's effort to conceal nonprivileged evidence.

"In the present case, however, the police officers warned defendant that he had the right to remain silent and that anything he said could be used against him. This warning did not distinguish between speech in terms of communications and speech for voice identification, between a refusal to speak free from sanctions and a refusal to speak productive of detrimental inferences. That distinction would hardly occur to a layman unless it was called to his attention. Thus, defendant's refusal to speak might well have been the direct result of the police warning and cannot be used against him. \* \* \*

"The usual Fifth Amendment warning that a suspect has a right to remain silent creates this problem, for if taken literally it includes the right not to speak at all. After having given such a warning, if the police direct a defendant to speak for voice identification and he refuses, they must, as a prerequisite to the use of the defendant's refusal to speak as evidence of consciousness of guilt, advise him that the right to remain silent does not include the right to refuse to participate in such a test."

See also Spectrogram Voice Identification, 19 Am.Jur., Proof of Facts, 423.

I consider that nothing in Gilbert v. State of California, supra, detracts from the foregoing quoted views.

From the foregoing, I conclude that in trials after June 12, 1967, even with counsel attending a prisoner at a pre-trial line up, after the defendant has been properly warned and advised both a la *Miranda* and per *Ellis*, his refusal to speak for voice identification is admissible as to guilty conduct on his part.